In re John P. COLFER and
Jean L. Colfer, Debtors.

In re Michael A. MONSIVAIS and
Beth A. Monsivais, Debtors.

Bankruptcy Nos. 92–10682, 92–21177.

United States Bankruptcy Court,
D. Maine.

Oct. 6, 1993.

Stanley F. Greenberg, Greenberg & Greenberg, Portland, ME, for Sears Roebuck and Town & Country Federal Credit Union.

Samuel J. Humpert, Waterville, ME, for debtors Colfer.

Robert H. Avaunt, Zuckerman, Avaunt, Devine & Page, Gray, ME, for debtors Monsivais.

### MEMORANDUM OF DECISION

JAMES B. HAINES, Jr., Bankruptcy Judge.

Before the court in these consolidated Chapter 13 cases are the debtors' plans.[1] Each plan proposes two classes of nonpriority, unsecured debt. One class, consisting of nondischargeable educational loan obligations, is to receive a 100% dividend. The other class, consisting of all other general unsecured claims, will receive substantially less. In each case, an unsecured creditor has objected to confirmation.[2]

Whether the Code permits confirmation of a Chapter 13 plan that separately classi-

---

**1.** Chapter 13 of the Bankruptcy Code appears at 11 U.S.C. §§ 1301–1330. Throughout this memorandum, all references to the "Code" or to statutory sections are, unless otherwise indicated, to the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*

**2.** Sears, Roebuck & Co. opposes the Colfers' plan; Town & Country Federal Credit Union opposes the Monsivais' plan. Each is a general, unsecured, non-priority creditor against whom the debtors' proposed classifications discriminate.

---

fies and more favorably treats nondischargeable, nonpriority, unsecured obligations (including educational loans) is an open question in this circuit and in this district. For the reasons set forth below, I conclude that, although a Chapter 13 plan may separately classify categories of unsecured debt, the proponents of the plans at bar, relying only upon the educational loans' nondischargeability to justify their classification schemes, have failed to demonstrate that their plans do not unfairly discriminate. Therefore, I will sustain objections to the plans' confirmation, leaving it to the debtors to revise their proposals.

### FACTS[3]

#### 1. The Colfers

John and Jean Colfer filed for Chapter 13 relief on September 14, 1992. Their unsecured, nonpriority debts total $14,436.61. The Colfers owe $1,825.92 to the United States Department of Education for "educational loans" within the meaning of §§ 523(a)(8) and 1328(a)(2).[4] The Colfers' five-year plan proposes to pay 100% on the Department of Education debt and 17.56% to all other nonpriority unsecured creditors. If separate classification were eliminated, the unsecured creditors' dividend would be over 30%. Of course, a substantial portion of the educational loan obligation would remain unpaid upon the plan's completion.

#### 2. The Monsivais'

Michael and Beth Monsivais filed their Chapter 13 petition on November 24, 1992. Their schedules list unsecured, nonpriority

---

**3.** This memorandum recites the undisputed facts and sets forth conclusions of law. Fed. R.Bankr.P. 7052 and 9014.

**4.** The Colfers scheduled the U.S. Department of Education obligation as a priority claim, but no party now argues that such is the case. *See* § 507(a) (priorities). There is no dispute that the obligation is an "educational loan."

The Colfers also owe $874.60 to the National Academy for Paralegal Studies. That debt receives no special treatment in their plan. Therefore, whether or not it is an "educational loan" is unimportant.

debts totalling at least $9,228.33,[5] including $2,300.00 to AFSA Data Corp. for educational loans.[6] The Monsivais' three-year plan proposes to pay AFSA 100% and 10.-22% to other unsecured creditors. Were all nonpriority, unsecured claims treated in one class, general unsecured creditors would approximately triple their dividend. The educational loan obligation would remain unpaid.

## DISCUSSION

Whether nonpriority, unsecured, nondischargeable educational loans may be separately classified and preferentially treated in a Chapter 13 plan is an issue that has been debated to a fare-thee-well, without consensus. *See In re Brown,* 152 B.R. 232, 233–235 (Bankr.N.D.Ill.1993). *See general-*

*ly* 2 Epstein, Nickles & White, *Bankruptcy* § 9.7, at 634 (1992) (hereinafter *"Epstein"*) (discussing Chapter 13 classification generally); 1 Keith M. Lundin, *Chapter 13 Bankruptcy* § 4.52 (1993) (hereinafter *"Lundin"*) (discussing Chapter 13 classification of nondischargeable claims).[7]

The debate emerged in its present form on the heels of 1990 legislation that excepted educational loan obligations from the Chapter 13 discharge.[8] Not surprisingly, after Congress extended the general rule of educational loan nondischargeability to Chapter 13, debtors began to propose plans that placed their student loan obligations in a separate class and paid them in full, while providing a smaller dividend to other unsecured creditors. *See generally Lundin* § 4.52, at 4–100q.[9]

---

**5.** As amended, the Monsivais schedules include two unliquidated, unsecured claims.

**6.** All parties agree that the Monsivais' debt to AFSA Data Corp. is an "educational loan" under the Code. *See supra* text accompanying note 4.

**7.** A number of courts have permitted debtors to classify separately and to favor nondischargeable student loan obligations. *See, e.g., In re Brown,* 153 B.R. at 244; *In re Dodds,* 140 B.R. 542, 544 (Bankr.D.Mont.1992); *In re Foreman,* 136 B.R. 532 (Bankr.S.D.Iowa 1992); *In re Boggan,* 125 B.R. 533, 534 (Bankr.N.D.Ill.1991); *In re Freshley,* 69 B.R. 96, 98 (Bankr.N.D.Ga.1987). Others have expressed approval of plans utilizing the cure and reinstatement provisions of § 1322(b)(5). *See, e.g., In re Benner,* 156 B.R. 631, 634 (Bankr.D.Minn.1993); *In re McKinney,* 118 B.R. 968, 971 (Bankr.S.D.Ohio 1990); *In re Christophe,* 151 B.R. 475, 480 (Bankr.N.D.Ill. 1993) (dictum; plan not approved); *In re Saulter,* 133 B.R. 148, 149–50 (Bankr.W.D.Mo.1991); *In re Newberry,* 84 B.R. 681, 684 (Bankr.E.D.Cal. 1988); *In re Geehan,* 59 B.R. 600, 602 (Bankr. S.D.Ohio 1986), quoting *In re Gaston,* 25 B.R. 571, 573 (Bankr.S.D.Ohio 1982). Still others have refused to confirm plans that separately classify and discriminate favorably toward student loan obligations. *See, e.g., In re Smalberger,* 157 B.R. 472, 477 (Bankr.D.Ore.1993); *In re Chapman,* 146 B.R. 411, 417–18 (Bankr.N.D.Ill. 1992); *In re Liggins,* 145 B.R. 227, 231 (Bankr. E.D.Va.1992) (dictum); *In re Keel,* 143 B.R. 915, 917 (Bankr.D.Neb.1992); *In re Taylor,* 137 B.R. 60, 64–65 (Bankr.W.D.Okl.1992); *In re Cronk,* 131 B.R. 710, 712 (Bankr.S.D.Iowa 1990); *In re Tucker,* 130 B.R. 71, 73–74 (Bankr.S.D.Iowa 1991); *In re Scheiber,* 129 B.R. 604, 607 (Bankr. D.Minn.1991); *In re Liggins,* 145 B.R. 227, 231 (Bankr.E.D.Va.1992); *In re Lawson,* 93 B.R. 979,

990 (Bankr.N.D.Ill.1988); *In re Furlow,* 70 B.R. 973, 978 (Bankr.E.D.Pa.1987).

**8.** Sec. 1328(a)(2) was amended by the Student Loan Default Prevention Initiative Act of 1990, which was a part of the Omnibus Budget Reconciliation Act of 1990, Pub.L. 101–508 (1990) by adding the reference to § 523(a)(8). Before the 1990 legislation, educational loans were generally not dischargeable in Chapter 7, but were generally dischargeable in Chapter 13. *See, e.g., In re Winthurst,* 97 B.R. 457 (Bankr.C.D.Ill. 1989); *In re Vensel,* 39 B.R. 866 (Bankr.E.D.Va. 1984).

All parties agree that the obligations that the debtors seek to separately classify and to prefer are within the § 523(a)(8) exception. A debtor may obtain discharge of such obligations upon a showing that excepting the debt from discharge would "impose an undue hardship on the debtor and the debtor's dependents" or if the obligation first became due more than seven years before the bankruptcy petition was filed. *See* § 523(a)(8)(A), (B). Neither the Colfers nor the Monsivais presently seek to establish grounds for discharge of their student loans under on such grounds.

**9.** Before the 1990 legislation, debtor's efforts to obtain discharge of student loan obligations through a Chapter 13 plan providing less than full payment were evaluated under § 1325(a)(3)'s general "good faith" standard for confirmation. *See, e.g., In re Lawson,* 93 B.R. 979, 985 (Bankr.N.D.Ill.1988); *In re Freshley,* 69 B.R. 96 (Bankr.N.D.Ga.1987); Note, *Forging Middle Ground: Revision of Student Loan Debts in Bankruptcy,* 75 Iowa L.Rev. 733, 760 n. 230 (1990). *See also In re Chapman,* 146 B.R. 411, 413 (Bankr.N.D.Ill.1992) (survey of case law considering pre–1990 good faith standard).

*1. Classification in Chapter 13.*

Nondischargeability of these debtors' educational loan obligations is a given. The statutory context pertinent to confirmation of their plans extends to Chapter 13's provision that a plan may:

> (1) designate a class or classes of unsecured claims as provided in section 1122 ..., but may not discriminate unfairly against any class so designated; however, such plan may treat claims for a consumer debt of the debtor if an individual is liable on such consumer debt with the debtor differently than other unsecured claims....

11 U.S.C. § 1322(b).[10] The plan must provide "the same" treatment for each claim within a class. 11 U.S.C. § 1322(a)(3).

Based on a narrow interpretation of § 1322(b)(1), some courts have held that Chapter 13 plans may designate only those classes of unsecured claims expressly created or contemplated by the Code.[11] Other courts provide debtors broad latitude to separately classify and unequally treat unsecured debt.[12] Still others hold that § 1322(b)(1) provides debtors with flexibility to create separate classes of unsecured debt so long as the scheme does not "unfairly discriminate." [13]

■ I accept the general proposition that Chapter 13 provides debtors flexibility to classify unsecured claims in order to enhance their ability to propose and complete a feasible plan. *See In re Brown,* 152 B.R. at 239; *In re Chapman,* 146 B.R. 411, 416 (Bankr.N.D.Ill.1992); *In re Terry,* 78 B.R. 171, 173–74 (Bankr.E.D.Tenn.1987) (permitting classification "to facilitate performance of the plan or improve the debtors' rehabilitation"). *See generally* 1 *Lundin* § 4.47 at 4–100d.[14] The conclusion springs

---

**10.** Section 1322(b)(1) expressly references § 1122, which provides as follows:

> (a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.
> (b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

In neither of these cases is another individual liable "with the debtor" on the educational loan obligation. Thus, it is unnecessary to consider whether educational loans may be "consumer debt" within the meaning of § 1322(b)(1)'s final clause and the difference, if any, that the existence of a nondebtor co-obligor would work in the analysis employed here.

**11.** Those classes historically included "administrative convenience classes" and classes of subordinated debt. 11 U.S.C. §§ 1122(b), 510. *See Epstein* § 9.7 at 631–32 (citing, e.g., *In re Wolff,* 22 B.R. 510, 515 (Bankr. 9th Cir.1982) (Hughes, J., concurring); *In re McKenzie,* 4 B.R. 88, 90 (Bankr.W.D.N.Y.1980); and *In re Iacovoni,* 2 B.R. 256, 260 (Bankr.D.Utah 1980)). More recently, as reflected in the current version of the statute quoted in the text, co-signed consumer obligations constitute another statutorily approved classification. 11 U.S.C. § 1322(b)(1). Thus, some cases, e.g., *In re McKenzie,* were legislatively overruled when § 1322(b)(1) was amended to authorize separate classification of co-signed consumer debt. *Epstein* § 9.7 at 631 n. 6.

**12.** *See, e.g., In re Brown,* 152 B.R. at 237–238 (debtor may separately classify and discriminate to further debtor's "legitimate" interests, including full payment of otherwise nondischargeable debt); *In re Sutherland,* 3 B.R. 420, 422 (Bankr.W.D.Ark.1980) (plan may provide disparate treatment among classes of unsecured debt so long as each receives as much as it would in liquidation).

**13.** *See, e.g., In re Leser,* 939 F.2d 669, 672 (8th Cir.1991) (applying four-part test to assess fairness of plan discrimination). *See generally* 5 Lawrence P. King, *Collier on Bankruptcy,* ¶ 1322.05 (15th ed. 1993).

**14.** One commentator has observed that, "apart from the special proviso relating to consumer debts of the debtor on which another individual is liable with the debtor, which authorizes a different treatment for such debts—the general classification rules applying in Chapter 11 cases will also govern Chapter 13 cases." Riesenfeld, *Classification of Claims and Interests in Chapter 11 and 13 Cases,* 75 Cal.L.R. 391, 404 (1987).

In one respect, Chapter 13 presents classification issues less complex than Chapter 11. Because creditors do not vote on the Chapter 13 plan, manipulating classifications to meet § 1129(a)(10)'s requirement that an impaired class accept the plan is not a concern. *Cf., e.g., Heartland Fed. Sav. & Loan Asso. v. Briscoe Enterprises, Ltd., II (In re Briscoe Enterprises, Ltd., II),* 994 F.2d 1160, 1167 (5th Cir.1993) (permitting separate classification where debtor demonstrates business reason for it); *Greystone III Joint Venture,* 995 F.2d 1274, 1279 (5th Cir.

directly from § 1322(b)(1)'s language, which recognizes that a debtor may discriminate among classes of equal priority debt, so long as the discrimination is not unfair. *See Epstein* § 9–7 at 629–31.[15]

But different treatment may or may not constitute unequal treatment, let alone unfair discrimination. It may be that a Chapter 13 plan, while providing for essentially equal payment among classes of claims, calls for different terms of payment (e.g., different timing of distributions, "in kind" payment or provision of credits) to accommodate the facts and circumstances unique to the case.[16] Or it may be that some very

real discrimination is a plan's cornerstone and is arguably vital to its success.[17]

■ In other words, subject to § 1322(b)(1)'s prohibition of *unfair* discrimination, the Code does not require that all similar claims be classified together and treated identically. *Barnes v. Whelan*, 689 F.2d 193, 201 (D.C.Cir.1982); *In re Chapman*, 146 B.R. at 417; *In re Scheiber*, 129 B.R. at 606; *In re Terry*, 78 B.R. at 173; *In re Green*, 70 B.R. 164, 166 (Bankr. W.D.Ark.1986); *In re Johnson*, 69 B.R. 726, 728 (Bankr.W.D.N.Y.1987); *Ledford v. McCormick (In re McCormick)*, 27 B.R. 434, 437–38 (Bankr.S.D.Ohio 1983); *In re Dziedzic*, 9 B.R. 424, 427 (Bankr.S.D.Tex.

1991) ("thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan"), *cert. denied,* — U.S. —, 113 S.Ct. 72, 121 L.Ed.2d 37 (1992); *Hanson v. First Bank of South Dakota, N.A.,* 828 F.2d 1310, 1313 (8th Cir.1987) (discussing manipulation of classification to affect balloting and confirmation). *Cf. also Granada Wines, Inc. v. New England Teamsters & Trucking Industry Pension Fund,* 748 F.2d 42, 46 (1st Cir.1984) (separate classifications for unsecured creditors justified "where the legal character of their claims is such as to accord them a status different from the other unsecured creditors....") (dictum) (quoting *In re Los Angeles Land Investments Ltd.,* 282 F.Supp. 448, 453 (1968), *aff'd,* 447 F.2d 1366 (9th Cir.1971)).

15. Section 1322(a)(3) dictates that all claims within a class be treated alike. The permissive classification authorized by § 1322(b)(1) necessarily connotes that different classes will be treated differently.

One should appreciate that every classification is likely to result in some discrimination in favor of one creditor and against another. Because section 1325(b) requires that the debtor give up all of his disposable income in most cases, there is no "extra money" that will go to creditor A which does not come from creditor B. Put another way, modification of a debtor's plan is likely to be a zero sum game in which gains that go to one creditor because of classification or for other reasons, come out of the pockets of other creditors. (Plus one for creditor A is minus one for creditor B and the sum is zero.) That being the case, Congress must have intended that a certain level of discrimination is to be expected and is acceptable.

*Epstein* § 9–7 at 629–30.

16. *See, e.g., In re Foreman,* 136 B.R. 532 (Bankr. S.D.Iowa 1992) (court approved a plan that paid student loans earlier than other unsecured debt, but paid all claims at 100% of all unsecured debt). *See generally 5 Collier on Bankruptcy,*

*supra,* ¶ 1322.05 ("a proposal to defer distribution on the claims of one class of general unsecured claims until after completion of payments to another class might very well be considered discrimination against the deferred class, depending on the circumstances of the case").

17. *See In re Smalberger,* 157 B.R. at 476–77; *In re Keel,* 143 B.R. 915, 916–917 (Bankr.D.Neb. 1992) (plan confirmation denied because no showing that discriminatory treatment necessary to permit completion of Chapter 13 plan); *In re Tucker,* 130 B.R. 71, 73–74 (Bankr. S.D.Iowa 1991) (showing of necessity required).

Also, it may be that no party-in-interest objects to confirmation of a classifying plan. Whether the court has an independent obligation to ensure that no unfair discrimination is worked by a Chapter 13 plan to which no party-in-interest has objected is not an issue raised by today's cases. *See In re Lawson,* 93 B.R. at 981 (holding that court has independent obligation to consider whether debtor has satisfied requirements for confirmation, even in the absence of objections). *Cf. Williams v. Hibernia Nat'l Bank (In re Williams),* 850 F.2d 250, 253 (5th Cir.1988) (Chapter 11; court has independent duty to determine whether plan meets requirements for cram-down confirmation).

The mandatory provisions of § 1322(a)(3) require only that the plan treat claims within a single class in the same fashion. Concerns about classification and discrimination arise from a debtor's exercise of the option to classify provided by § 1322(b)(1). Thus, the court's duty under § 1325(a)(1) to ensure that the plan complies with the provisions of Chapter 13 and the Code likely does not extend to taking up the issue of unfair discrimination *sua sponte. See In re Szostek,* 886 F.2d 1405, 1411–12 (3rd Cir. 1989). Of course, the debtor's good faith in proposing the plan, a mandatory confirmation requirement, may be scrutinized in every case. § 1325(a)(3); Fed.R.Bankr.P. 3020(b)(1).

1981); *In re Blackwell,* 5 B.R. 748, 750–51 (Bankr.W.D.Mich.1980); *In re Kovich,* 4 B.R. 403, 405 (Bankr.W.D.Mich.1980); *In re Gay,* 3 B.R. 336, 338 (Bankr.D.Colo. 1980).

### 2. Assessing the "Fairness" of Plan Discrimination.

■ Given that a Chapter 13 plan may separately classify and disparately treat like claims, how does the court enforce § 1322(b)(1)'s requirement that the plan not discriminate unfairly?

A number of courts invoke the four-part test adopted by the Eighth Circuit in *In re Leser,* 939 F.2d 669, 672 (8th Cir.1991):

Lacking more explicit direction from Congress, courts have developed a four-part test to determine whether a proposed separate classification of unsecured claims is fair by inquiring: (1) whether the discrimination has a reasonable basis; (2) whether the debtor can carry out a plan without the discrimination; (3) whether the discrimination is proposed in good faith; and (4) whether the degree of discrimination is directly related to the basis or rationale for the discrimination.

*See, e.g., In re Wolff,* 22 B.R. at 512; *In re Chapman,* 146 B.R. at 417 (collecting cases); *In re Saulter,* 133 B.R. at 148; *In re Cronk,* 131 B.R. 710, 712 (Bankr.

N.D.Ga.1990); 1 *Lundin* § 4.47 at 4–100b n. 180; 2 *Epstein* § 9–7 at 633 n. 12.

The four-part test is not universally employed. One recent opinion simply asks whether plan classification reflects "legitimate interests of the debtor." *In re Brown,* 152 B.R. at 327–28. *See also In re Boggan,* 125 B.R. at 534 ("the Chapter 13 debtor will nearly always have a valid interest in giving educational loans special treatment").

Some courts require that the discrimination provide some offsetting benefit to the class or classes against which the discrimination operates. *In re Chapman,* 146 B.R. at 419; *In re Keel,* 143 B.R. at 916–17; *In re Scheiber,* 129 B.R. at 606. Another group inquires whether the discrimination is necessary to the plan's fulfillment. *James v. Moore (In re James),* 150 B.R. 479, 485 (Bankr.M.D.Ga.1993) ("virtually impossible to propose a successful Chapter 13 plan that does not provide for payment in full of such [child support] obligations"); *In re Keel,* 143 B.R. at 916; *In re Tucker,* 130 B.R. at 73; *In re Storberg,* 94 B.R. 144, 148 (Bankr.D.Minn.1988); *In re Furlow,* 70 B.R. at 978. *See also In re Smalberger,* 157 B.R. at 477 (describing a "viability of the plan" test).

■ No single test or formula provides a satisfactory structure for all contexts.[18]

---

18. Tests that set out distinct categories for consideration have facial appeal. But "things get strange down among the tiny bits. Sometimes things overlap, and it's hard to tell whose electron is whose, hard to tell where one edge stops and another starts, hard to tell when you've stopped thinking about one thing and started on another." Eric Kraft, *Where Do You Stop? The Personal History, Adventures, Experiences & Observations of Peter Leroy (continued)* at 175–76 (Crown Publishers, New York 1992). *See also United States v. Santana,* 6 F.3d 1 (1st Cir.1993) ("Although we recognize that formulaic tests offer administrative convenience and ease in application, we also recognize that neither life nor law can always be made convenient and easy.")

*In re Brown, supra,* convincingly laid bare the shortcomings of the four-part *Leser* test. The test has been lifted from the context in which it was first articulated by the bankruptcy court in *In re Kovich,* 4 B.R. 403 (Bankr.W.D.Mich.1980), and its reliance on the notion of reasonableness,

without reference to the interests and purposes in light of which reasonableness is to be limned is problematic. *In re Brown,* 152 B.R. at 235; *In re Harris,* 62 B.R. 391, 394–96 (Bankr.E.D.Mich. 1986).

The many courts that follow *Kovich* apply Judge Howard's four rules in quite different settings and in thoroughly unpredictable ways. It is clear that many judges use these tests simply to indulge their own views about what is fair and what is not. It is also clear that the language does not mean the same thing to any two judges and that cases often stray far from the ideas Judge Howard appeared to have in the *Kovich* case.

2 *Epstein* § 9–7 at 633 (footnotes omitted). *See also In re Chapman,* 146 B.R. at 420 (considering separate classification of educational loan obligations, Judge Ginsberg concluded that the four-part test "adds little" to the analysis.)

The test set forth in *In re Brown* is no more enlightening. *Brown* holds that "a discrimination between classes of unsecured creditors in a Chapter 13 plan is "fair" under § 1322(b)(1) to

The question, as Judge Ginsberg recognized in *In re Chapman*, boils down to whether the plan reflects a reasonable balance in "the relative benefits allocated to the debtor and creditors from the proposed discrimination." 146 B.R. at 419.[19] Finally, any analysis of the relative benefits (and detriments) resulting from the proposed discrimination must be undertaken in light of the impact of the discrimination on Congress' chosen statutory definition of the legitimate interests and expectations of parties-in-interest to Chapter 13 proceedings.[20]

### 3. The Burden of Justifying Plan Discrimination.

■ As plan proponents, the debtors bear the burden of demonstrating that their plans meet the Code's requirements for confirmation. *AMFAC Distrib. Corp. v. Wolff (In re Wolff)* 22 B.R. 510, 512 (Bankr. 9th Cir.1982). *See also In re Maylin*, 155 B.R. 605, 614 (Bankr.D.Me.1993)

("a movant bears the burden of proof on the elements necessary to warrant the relief he or she seeks") (citing *Buco v. Salvatore (In re Salvatore)*, 46 B.R. 247, 253 (Bankr.D.R.I.1984)).

■ The objecting creditors have properly raised the issue whether the Colfer and Monsivais plans unfairly discriminate. Thus, the burden rests on the debtors to persuade the court, by a preponderance of the evidence,[21] that the classification and treatment they propose does not discriminate unfairly. *See In re Chapman*, 146 B.R. at 417; *In re Harris*, 62 B.R. 391, 394 (Bankr.E.D.Mich.1986). *See also Lundin* § 5.9.

### 4. Nondischargeability as a Basis for Plan Discrimination.

■ With these considerations in mind, I conclude that the two plans before me are not confirmable for a relatively straightfor-

---

the extent, and only to the extent, that it rationally furthers an articulated, legitimate interest of the debtor." 152 B.R. at 238. Framing the inquiry in terms of the "legitimate" interests of the debtor provides no surer mooring than the four-part test's abstract reference to "reasonableness" and is equally redundant of the general requirement that a Chapter 13 plan be proposed in good faith. Unless the "legitimacy" of the interests motivating the discrimination is determined by reference to pertinent provisions of the Code, the analysis can become a playground of judicial policymaking.

19. Although some courts consider that the permissibility of classification and discrimination can appropriately be assayed by applying a strict necessity or "viability of the plan" test, *e.g., In re Smalberger*, 157 B.R. at 477, I do not go so far. Such a test sounds practical and objective. Sometimes, as when incarceration for contempt or revocation of probation is in the offing, it may be crystal clear that separate classification is required. But in the context of plan confirmation in more routine cases, "necessity" will be a more eely notion. One can seldom be certain that a plan will or will not succeed in view of all or any of its provisions and the uncertainty of the future. No matter how you approach it, the "need" for discriminatory classification will likely be a matter of degree.

20. Evaluating the fairness of plan discrimination necessitates considering what the Code provides in terms of distributional priorities, *e.g.,* §§ 507(a), 1325(a)(2); fresh start, *e.g.,* §§ 523,

1328; expressly permitted classification, *e.g.,* §§ 1122(b) (administrative convenience), 1322(b)(1) (consumer debt with co-obligor); availability of subordination, *e.g.,* § 510; extent of the estate, *e.g.,* §§ 541, 1306; and amounts available for distribution under the plan, *e.g.,* § 1325(b).

In light of the Code provisions that touch upon the subject, particularly §§ 510, 1322(b)(1) and 1325(a)(2), I do not accept the proposition that unsecured creditors have no legitimate expectation of *pro rata* treatment. *See, e.g., In re Chapman*, 146 B.R. at 418–419; *In re Saulter*, 133 B.R. at 149. *See also Epstein* § 9.7 at 636 (non-discrimination should be the norm; authorization to discriminate should be read narrowly). *But see In re Brown*, 152 B.R. at 239 (denying that *pro rata* distribution is a legitimate expectation of unsecured creditors).

Similarly, in view of §§ 541, 1306 and 1325, I reject the notion that a Chapter 13 debtor may discriminate all he or she chooses, so long as the creditors against whom the discrimination operates receive as much as they would in liquidation. *See In re Furlow*, 70 B.R. at 976. *But see In re Sutherland*, 3 B.R. at 422.

21. *Cf. Matter of Briscoe Enterprises, Ltd. II*, 994 F.2d 1160, 1163–1165 (5th Cir.1993) (considering confirmation of Chapter 11 plan). *Cf. also Grogan v. Garner*, 498 U.S. 279, 286–287, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991) (holding that preponderance of evidence was correct standard of proof to show nondischargeability under 11 U.S.C. § 523(a)).

ward reason: The debtors rest on the assertion that the nondischargeability of educational loans, by itself, provides a sufficient basis to justify discrimination in their favor. To the contrary, more is required. If nondischargeability alone were sufficient reason to establish that discrimination on the order of that proposed by these debtors is "fair," the result would be at odds with significant aspects of the Code's overall Chapter 13 framework.

### a. Priorities and De Facto Subordination.

A plan that proposes to pay nondischargeable, nonpriority unsecured debt in full while paying other unsecured obligations a lesser percentage places the entire burden of paying the nondischargeable obligation on the other unsecured creditors. "Every extra dime that goes to holders of nondischargeable claims in a Chapter 13 case is one less dime that holders of dischargeable claims get under the plan." *In re Chapman*, 146 B.R. at 415.

■ As to educational loans specifically, if Congress had intended to give educational loan obligations a distributional priority, it could have done so by including them in the list of statutory priorities. *See* 11 U.S.C. §§ 507(a), 1322(b)(2).[22] Or, if it considered that their character alone justified preferential classification, Congress could have amended § 1322(b)(1) to provide expressly that such obligations, like cosigned consumer debt, may be separately classified. *See In re Smalberger*, 157 B.R. at 475. In the absence of such legislative action, I cannot conclude that Congress intended that educational loans should be paid ahead of other nonpriority unsecured claims within the bankruptcy as well as remain undischarged after the bankruptcy.

As Judge Hess has observed:

> It would seem unfair to tell creditors holding dischargeable claims that other creditors who hold non-dischargeable claims (and who may thus pursue post-bankruptcy collection efforts against the debtor) are to be preferred not only after the bankruptcy case is completed but also during the time payments are being made to creditors. To put it colloquially, receipt of payments under the chapter 13 plan is the only shot at collecting from the debtor for those creditors holding dischargeable claims while student loan creditors may have more than one shot at collection. This fact would seem to argue against allowing a debtor to separately classify non-dischargeable student loan debts for preferential treatment.

*In re Smalberger*, 157 B.R. at 475–76. *Cf. In re Mammoth Mart, Inc.*, 536 F.2d 950, 953 (1st Cir.1976) (Act case; "To give priority to a claimant not clearly entitled thereto is not only inconsistent with the policy of equality of distribution; it dilutes the value of priority for those creditors Congress intended to prefer.")[23]

### b. The "Fresh Start" Argument.

The plan proponents urge that discrimination in favor of nondischargeable debt furthers a debtor's legitimate interest in a "fresh start." The argument is unconvincing. Reliance on idealized notions of "fresh start," divorced from the very statute that provides that fresh start, is inappropriate.

Congress has created, defined and limited the fresh start through, *inter alia*, the

---

**22.** *In re Chapman* observed that the discrimination proposed by the debtor created a *de facto* priority scheme at variance with § 507 or, more accurately, that it effectively subordinated some general unsecured claims to others without establishing grounds for subordination pursuant to § 510 and pertinent case law. 146 B.R. at 418.

**23.** Given the relative size educational loan obligations might be expected to bear to other debt, one can understand legislative reluctance to include educational loans as a statutory priority because to do so might make the prospects for payment to general unsecured creditors remote. *See* §§ 726(a)(1) (Chapter 7 distributions go to priority claims ahead of unsecured claims), 1322(a)(2) (Chapter 13 plan must provide for full payment of priority claims). Congress could have gone so far as to bestow upon educational loans both priority and nondischargeability. *Cf.* §§ 507(a)(7), 523(a)(7), 1322(a)(2) (certain tax obligations receive priority in both Chapter 7 and Chapter 13, and are nondischargeable in Chapter 7).

Code's discharge provisions.[24] Surely, the bankruptcy laws do effect a fresh start policy. But the same laws significantly limit the fresh start's scope. *Cf. Grogan v. Garner,* 498 U.S. 279, 286–87, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991) (discussing limitations on fresh start relating to § 523(a)(2) discharge exception).

Notwithstanding debtors' desire to emerge from bankruptcy free of debt's yoke, and notwithstanding policies encouraging rehabilitation over liquidation, Chapter 13 now proceeds on the premise that certain types of debt (more than existed at the time of the Code's enactment) will survive discharge.[25] To leave such obligations behind, Chapter 13 debtors must either avail themselves of some exception to the rule of nondischargeability, *e.g.,* § 523(a)(8)(A) or (B), or the claim must be paid in full, in a fashion consistent with the statutory scheme, during the life of the bankruptcy.[26]

■ Congress withdrew educational loans from the Chapter 13 discharge. In doing so, it distinguished them as obligations that may be collected after discharge. Congress has made the call. The courts should not approve as "fair" discriminatory classification schemes "needed" only for the purpose of mitigating the consequences of statutory discharge exceptions.

### c. Discharge and Distribution Policies.

It is true that cases have permitted classification favoring nondischargeable obligations in at least one context: alimony and support arrearages. *See, e.g., In re Leser,* 939 F.2d 669 (8th Cir.1991); *In re Benner,* 146 B.R. 265 (Bankr.D.Mont.1992); *In re Husted,* 142 B.R. 72 (Bankr.W.D.N.Y. 1992) *In re Harris,* 132 B.R. 166 (Bankr. S.D.Iowa 1989) (denying confirmation on good faith grounds); *In re Whittaker,* 113 B.R. 531 (Bankr.D.Minn.1990); *In re Storberg,* 94 B.R. 144 (Bankr.D.Minn.1988); *In re Davidson,* 72 B.R. 384 (Bankr.D.Colo. 1987) (denying confirmation on feasibility grounds). Although the support and alimony cases are analogous to the extent that they address preferential classification of a type of nondischargeable debt, they are not persuasive for several reasons.

Courts have sometimes approved separate classification of family support obligations on the ground that payment of such debts is favored in public policy. *See In re Leser,* 939 F.2d at 672; *In re Storberg,* 94 B.R. at 147. *Cf. In re Scheiber,* 129 B.R. at 606 (confirmation of plan separately classifying student loans denied because their repayment not considered "as important" as family support obligations). But Congress has separately and expressly addressed both priority and dischargeability. It withheld the former, but conferred the latter. How, then, can a bankruptcy judge invoke "public policy" to afford a distributional priority to nondischargeable obligations by virtue of their nondischargeability alone?

The approach to classification and discrimination I adopt today focuses on the

---

**24.** Other provisions, most notably the Code's sections treating exemptions, the discharge injunction and nondiscrimination are important to the fresh start, as well. *See* 11 U.S.C. §§ 522 (exemptions), 524 (effect of discharge), 525 (protection against discrimination).

**25.** Since its enactment, § 523(a) has been amended by the Omnibus Budget Reconciliation Act of 1981, Pub.L. 97–35; the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353; Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy Act of 1986, Pub.L. 99–554; and the Crime Control Act of 1990, Pub.L. 101–647. Section 1328(a) was amended by the Student Loan Default Prevention Initiative Act of 1990,

which was a part of the Omnibus Budget Reconciliation Act of 1990, Pub.L. 101–508, and by the Criminal Victims Protection Act of 1990, Pub.L. 101–581. These amendments added crime victim reparations, as well as educational loans, to the list of obligations that survive a Chapter 13 discharge.

**26.** *See In re Smalberger,* 157 B.R. at 477 n. 2. (discussing options available to manage nondischargeable obligations, including "Chapter 20" and separate classification within a plan that pays all unsecured claims *pro rata* for no less than thirty-six months, then proceeds to pay only the separately classified nondischargeable debt for the duration of the plan) (citing *In re Dodds,* 140 B.R. 542 (Bankr.D.Mont.1992)).

facts and circumstances of each case as they relate to the detriments and benefits of classification, to the interests of parties, to a debtor's ability to effectuate a plan and to relevant provisions of the Code. There may be circumstances in which it is essential that support or alimony obligations be separately classified and distributionally preferred if the debtor is to effect a plan. *See In re Smalberger,* 157 B.R. at 477 (discussing preference of family support or criminal restitution claims to avoid incarceration); *In re Keel,* 143 B.R. 915, 916 (Bankr.D.Neb.1992). But the analysis must be case specific. Separately classifying a certain type of debt will not result in unfair discrimination in one set of circumstances. However, such may not always be the case.

### e. Today's Holding in Perspective.

Does all this mean that a debtor may never separately classify and discriminate in favor of nondischargeable obligations? Of course not. Rather, nondischargeability does not by itself provide grounds sufficient to declare that proposed discrimination is fair under § 1322(b)(1). Instances may arise in which Chapter 13 is advantageous to the general unsecured creditors and in which the debtor's circumstances militate in favor of disparate classification and treatment of like claims if a plan is to be effectuated. Such instances can only be evaluated on a case by case basis.

### CONCLUSION

Each of the plans before me proposes to provide educational loan creditors with full payment, while providing other unsecured creditors of equal statutory priority a far lesser dividend. There has been no showing that the proposed classification and discrimination reflect a reasonable balance of benefits and detriments to the affected creditors. I therefore conclude that each plan unfairly discriminates within the meaning of § 1322(b)(1) and, therefore, may not be confirmed.

The debtors may bring forward amended plans without the objectionable discrimination.

Separate orders denying confirmation of each plan shall issue forthwith.