**Jack McCULLOUGH, Trustee, Appellant,**

v.

**Willie M. BROWN, et al., Appellees.**

**In re Willie M. BROWN (92 B 14365), Marie Butler (92 B 14806), Cleo Pollard (92 B 20029) and Myron Thomas and Eleanor Thomas (92 B 20758), Debtors.**

No. 93 C 1891.

United States District Court, N.D. Illinois, E.D.

Dec. 30, 1993.

---

*MEMORANDUM OPINION
AND ORDER*

SHADUR, Senior District Judge.

Standing Trustee Jack McCullough ("Trustee") has appealed Bankruptcy Judge Eugene Wedoff's confirmation (as set out in the "Opinion," 152 B.R. 232 (Bankr.N.D.Ill. 1993 [1])) of the bankruptcy plans of a group of Chapter 13 debtors: Willie Brown, Marie Butler ("Butler"), Cleo Pollard and Myron and Eleanor Thomas. Although Butler alone has responded to Trustee's appeal, both the facts and the legal issues are common to the several cases—so that this opinion will speak of "Debtor" individually and "Debtors" collectively, rather than referring to Butler alone. In any event, for the reasons discussed hereafter, the Bankruptcy Judge's decision confirming the plans—thoughtful though it is—is reversed.

*Facts*

There is no quarrel as to the facts underlying this dispute. Each Debtor sought the shelter of Chapter 13 of the Bankruptcy Code ("Code" [2]) because a substantial part of his or her indebtedness comprised student loan obligations (which are by law nondischargeable in bankruptcy). Each Debtor then submitted a plan dividing his or her general nonpriority unsecured claims into two classes: student loans and the rest of the unsecured claims.

■ At the heart of the current dispute lie Debtors' proposals to pay their debts in the student loan class in full, even though such an arrangement leaves only enough money available during the life of each plan to satisfy 10% of the claim of every other unsecured creditor. Each plan results in the Debtor's emergence from Chapter 13 free of unsecured debt, while if only a single class of unsecured creditors had been created:

1. From the creditors' point of view, the holders of all unsecured obligations other than student loans would have re-

Sheryl A. Fyock, for appellant/Trustee.

Bennett A. Kahn, for appellee Marie Butler.

---

1. Citations to the Opinion will take the form "Opinion—," referring to the B.R. page number but not its volume number.

2. Citations to the Code will take the form "Section—," referring to the Title 11 numbering.

ceived (on a parity with the student loan holders) substantially more than the 10% provided for under the plan.

2. From the Debtor's point of view, he or she would have been left post-plan with a substantial balance of the student loan unpaid (because of its nondischargeability).

Trustee readily acknowledges that apart from that preferential treatment there are no other objections to confirmation.[3]

### Statutory Backdrop

Treatment of debtors saddled with educational debt obligations has always occupied a special place in the Code. Until 1990 such student loans had been dischargeable under Chapter 13, though nondischargeable in filings under Chapters 7, 11 and 12. Then in that year Congress passed the Student Loan Default Prevention Initiative Act, amending the Code by making the nondischargeability provision of Section 523(a)(8) applicable to Chapter 13 filings as well.[4]

Instead of accomplishing its intended goal, that change has spawned a somewhat revised (rather than a new) cottage industry. In response to Congress' decision to legislate student loan nondischargeability into Chapter 13, creative debtors have turned to a less direct method by which they still free themselves from such loans and forge a fresh post-bankruptcy start. Such debtors (including Debtors here) simply bifurcate their plans so as to repay their nondischargeable student loan obligations in full at the expense of their obligors who own other nonsecured debts (all of which are dischargeable).

Debtors argue that such a plan is sanctioned by Section 1322(b)(1):

(b) Subject to subsections (a) and (c) of this section [which are not at issue here], the plan may—

(1) designate a class or classes of unsecured claims, as provided in section 1122 of this title, but may not discriminate unfairly against any class so designated; however, such plan may treat claims for a consumer debt of the debtor if an individual is liable on such consumer debt with the debtor differently than other unsecured claims.

In turn Section 1122(a) states in part that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." Separate classification of student loan debts as such is not at issue in this appeal—as 5 *Collier on Bankruptcy* ("Collier") § 1322.05, at 1322–12 to 1322–13 (15th ed. 1993) (footnotes omitted) says:

Chapter 13 debtors have proposed, and courts have approved, separate classifications for landlords, attorneys, doctors, trade creditors and even banks extending credit necessary for the continued operation of the debtor's business.

Instead it is the right to discriminate as between the classes that is contested here.[5]

■ Thus no taint automatically attaches to a Chapter 13 plan merely because it creates a differentiation in treatment among classes of unsecured claims—just because it "discriminate[s] against" one or more classes in the nonpejorative sense of the word "discriminate." Instead the statutory prohibition

---

3. Although no party objected to the proposed plans, the Bankruptcy Judge has an independent obligation to determine whether the plan fulfills the requirements for confirmation under Chapter 13 (*In re Christophe*, 151 B.R. 475, 476 (Bankr. N.D.Ill.1993)).

4. Section 523(a)(8) as amended reads:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

\* \* \* \* \* \*

(8) for an educational benefit overpayment or loan made insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obli-

gation to repay funds received as an educational benefit, scholarship or stipend, unless—

(A) such loan, benefit, scholarship, or stipend overpayment first became due more than 7 years (exclusive of any applicable suspension of the repayment period) before the date of the filing of the petition; or

(B) excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents[.]

5. Judge Wedoff has summarized the interaction between Section 1122 (classifications) and Section 1322 (discrimination) in Opinion at 235 n. 3.

is limited to plans that "discriminate unfairly"—and of course Congress has chosen to leave the critical word "unfairly" wholly undefined!

### Debtors' Proposed Dual–Class Plans

Whether Debtors' plans (which are exemplary of a widespread pattern of Chapter 13 plans everywhere) "discriminate unfairly" poses a question on which this Court writes on a virtually clean Article III slate. Although a substantial number of bankruptcy courts have dealt with the precise issue (see Appendix), no Court of Appeals and only a single District Court[6] has done so. Hence this Court is bound by no precedent and will proceed to review the question of law from scratch (*In re Winer,* 158 B.R. 736, 740 (N.D.Ill.1993)).

In the absence of a congressional directive defining (or even fleshing out) the term "unfairly" as employed in Section 1322(b)(1), courts must at least try to formulate some reasoned approach to assessing fairness vel non—lest the process reduce itself to an ad hoc variant on Justice Stewart's famed "I know it when I see it" aphorism to identify "obscenity" (in his concurrence in *Jacobellis v. Ohio,* 378 U.S. 184, 197 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793 (1964)). By far the majority of bankruptcy courts faced with the current problem have applied the four-part test originally articulated in *In re Kovich,* 4 B.R. 403 (Bankr.W.D.Mich.1980) and later employed in *In re Leser,* 939 F.2d 669, 672 (8th Cir.1991) (affirming discriminatory treatment in favor of claims for child support arrearages), the only Court of Appeals decision that to this Court's knowledge has attempted to capture the elusive "discriminate unfairly" phrase:

(1) whether the discrimination has a reasonable basis; (2) whether the debtor can carry out a plan without the discrimination; (3) whether the discrimination is proposed in good faith; (4) whether the degree of discrimination is directly related to the basis or rationale for the discrimination.

### "Reasonable Basis" and "Degree of Discrimination"[7]

Some bankruptcy courts have been persuaded that the nondischargeable nature of student loan obligations may itself constitute a "reasonable basis" for discriminating among classes of unsecured creditors (see, e.g., *In re Benner,* 156 B.R. 631, 634 (Bankr. D.Minn.1993) (pointing to the debtor's interest in receiving a fresh start by emerging from bankruptcy unencumbered with nondischargeable debt); *In re Keel,* 143 B.R. 915, 916 (Bankr.D.Neb.1992)). But many more courts have refused to accept such a rationale, concluding that nondischargeability as such is not a reasonable basis for discriminatory treatment—in addition to *Groves,* 160 B.R. at 122–23, a sampling of bankruptcy court decisions to that effect is provided by *In re Tucker,* 150 B.R. 203, 205 (Bankr. N.D.Ohio 1992); *In re Eitemiller,* 149 B.R. 626, 629 (Bankr.D.Idaho 1993); *In re Saulter,* 133 B.R. 148, 149 (Bankr.W.D.Mo.1991) and *In re Tucker,* 130 B.R. 71, 73 (Bankr. S.D.Iowa 1991).

As might be anticipated from its own lack of precision, the "reasonable basis" formulation is no more useful than the undefined statutory concept of "discriminate unfairly." In the end a judge who applies such an amorphous "test" wields a nearly unchecked discretion, implementing his or her personal preferences by the manner in which the judge goes about deciding on reasonableness: whose interests are taken into account and with respect to whom reasonableness is determined. Instead of thus simply shifting the inquiry to a different level of abstraction, this opinion will later seek to explore the

---

**6.** *Groves v. LaBarge,* 160 B.R. 121 (E.D.Mo.1993) is the only Article III court case on point uncovered by this Court's research. *Groves* rejected several plans under which the debtors would have paid 100% of their student loans and only 10% to 40% on other unsecured claims. After reviewing many of the same cases considered in this opinion, *Groves* applied the most-often-used four-prong test (which will be discussed in detail below) and found those plans to be unfairly discriminatory.

**7.** These first and fourth factors in the *Kovich* formulation are really inseparable as a practical matter. As suggested by the very manner in which the fourth is framed, it is essentially subsumed as a relevant component of the first.

various underlying assumptions and their comparative validity and persuasiveness.

*Necessity for the Plan's Viability*

This second *Kovich* factor ordinarily weighs against debtors who try to accomplish the goal sought by Debtors here. As *Groves,* 160 B.R. at 122–23 put it:

> Under most circumstances, a student loan debtor can carry out a Chapter 13 plan without an extreme imbalance between the treatment of student loan claims and other unsecured claims.

If they were so inclined, debtors could almost always design plans that do not discriminate. One way to do so would be simply to treat student loans as long term debt under Section 1322(b)(5) (see *Benner,* 156 B.R. at 634 ("I conclude therefore, that student loan debt which is properly treated outside the plan in accordance with section 1322(b)(5), does not result in unfair discrimination in violation of section 1322(b)(1)"); *Saulter,* 133 B.R. at 150). But see *In re Tucker,* 159 B.R. 325, 329 (Bankr.D.Mont.1993) (courts are reluctant to rewrite a debtor's plans).

Moreover, as Judge Wedoff has pointed out (Opinion at 236), it is not clear why the test should be phrased in such a way as to make necessity a required element of fairness to begin with. To be sure, necessity may have a place in the analysis. But the fact that a debtor has the ability to formulate an alternative nondiscriminatory plan should not alone be sufficient to render it unfair (*Benner,* 156 B.R. at 634 ("it makes no sense to hold that the four-part test of *Leser* is not met solely because the debtors can carry out a plan that would essentially deny them their fresh start")). After all, Congress has expressly bestowed upon debtors the right to engage in some discrimination (*In re Johnson,* 69 B.R. 726, 728 (Bankr.W.D.N.Y.1987) ("Some difference in the treatment of unsecured claims must have been contemplated by Congress, or the provision for classifying

claims under § 1322(b)(1) would be purposeless")).

Thus the second component of the test as currently framed also suffers from an illogical analytical framework.[8] So far, then, three of the four factors really evanesce as useful tools with which to conduct the current inquiry.

*Good Faith*

Judge Wedoff and many others say (with good reason) that the good faith factor adds nothing to the inquiry—after all, good faith is a prerequisite to plan confirmation in any event. Section 1325(a)(3) provides that a court shall confirm a plan (that otherwise complies with Chapter 13) *only* if it "has been proposed in good faith and not by any means forbidden by law." In addition to that obvious redundancy, the opinion by Judge Wedoff's colleague Judge Robert Ginsberg in *In re Chapman,* 146 B.R. 411, 415 (Bankr. N.D.Ill.1992) (citations omitted, emphasis added) points out that the good faith inquiry is largely circular in any case:

> Indeed, the Seventh Circuit has held that the basic question to be answered in determining whether a Chapter 13 debtor is proceeding in good faith and has proposed her plan in good faith is whether the debtor's proposal to deal with creditor claims is fundamentally fair. Therefore, the question to be answered here is whether the debtor's proposed plan affords all of his unsecured creditors fundamental *fairness* in how they are treated under his proposed plan.

And even apart from that consideration, the limited record provided to this Court does not permit any real determination of objective good faith anyway.

\* \* \*

Thus, while application of the traditional four-part test would call for a ruling of unfair discrimination at the outset,[9] this Court

---

8. Application of this second factor could also lead to perverse results (*In re Smalberger,* 157 B.R. 472, 476 (Bankr.D.Or.1993), posing a hypothetical under which a monopoly supplier of an essential manufacturing input could extort the debtor into extreme discrimination in its favor).

9. As already indicated, most bankruptcy courts applying the test have reached the conclusion that the proposed plans discriminated unfairly (see Appendix). As one such court has said (*In re Lewman,* 157 B.R. 134, 136 (Bankr.S.D.Ind. 1992)):

> The courts have shown a clear trend to deny confirmation of such plans, finding the pro-

agrees with Judge Wedoff that the test does not provide much in terms of functional analysis. That view is fortified by the lack of substantive discussion that often accompanies application of that test (see, e.g., *In re Boggan*, 125 B.R. 533 (Bankr.N.D.Ill.1991)). Judge Wedoff's opinion develops the test's shortcomings in greater detail, stating that its problems stem from the fact that it originally evolved in *Kovich* as a case-specific inquiry, not as a universal test of fairness.

Accordingly this Court also agrees with Judge Wedoff in declining to embrace the four-part test as the controlling rule of law just because it has obtained a substantial bankruptcy court following in the past. But where this Court parts company with Judge Wedoff is in defining the appropriate replacement.

Judge Wedoff advocates a solely debtor-oriented "legitimate interest" test (Opinion at 237–38):

> [D]iscrimination between classes of unsecured creditors in a Chapter 13 plan is "fair" under Section 1322(b)(1) to the extent, and only to the extent, that it rationally furthers an articulated, legitimate interest of the debtor. This test avoids the problems of the four-part test: it defines the interest that render a discrimination reasonable; it does not limit discrimination to situations in which a plan cannot be carried out otherwise; and it makes good faith a separate inquiry from fair discrimination.

Accord, *Christophe*, 151 B.R. at 479, adopting that test as first articulated by Judge Wedoff in *In re Lawson*, 93 B.R. 979, 984 (Bankr. N.D.Ill.1988). That quoted analysis invokes the rubric and phraseology of equal protection jurisprudence, which does indeed take such an approach in evaluating the fundamental fairness of any differential treatment of separate classes of people. But the analysis depends on a false parallel, for it equates the decisionmaking status of a private debtor with that of a sovereign state. If a state government were to design a bankruptcy plan and propose some type of discriminatory treatment, perhaps such a rational interest test would be appropriate. But it is

posed classification to be unfair discrimina-

readily apparent that individual Chapter 13 debtors cannot properly be viewed as ranking on a parity with a sovereign charged with maximizing its citizens' welfare.

To expand a bit on the lack of parallel, the equality of treatment called for by the Fourteenth Amendment's Equal Protection Clause still permits a state government to engage in some discrimination in the interests of the greater good (serving a legitimate state interest). But that underlying rationale just does not fit where the actor is a private citizen seeking to enrich his or her individual pocket. At bottom, then, Judge Wedoff's "rational" or "legitimate" interest formulation imputes to bankrupt individuals the rulemaking force and legitimacy wielded by state governments: the authority to discriminate on the basis of a rational advancement of legitimate state interests. Such a comparison cannot fly.

There is another and equally basic flaw in Judge Wedoff's equal-protection-based test: It also goes well beyond the Equal Protection Clause's approach by regarding the situation solely from the perspective of the actor and not at all from the perspective of those being acted upon. That is a critical assumption tacitly built into Judge Wedoff's choice of words. By its very terms, the "rationally furthers an articulated, legitimate interest of the debtor" test presumes that the phrase "unfairly discriminates" means unfair only with respect to the *debtor* (who is, after all, the actor drafting the discriminatory classification). This opinion turns, then, to the invalidity of that rhetorical jump.

### *"Unfair" to Whom?*

Many (if not most) of the disputes under the Code involve the tension between a debtor's interest in garnering a fresh start and the creditors' concerns about repayment. Which of those two valid considerations is to prevail in this instance lies at the core of this dispute. And while the interests of the debtor may not be wholly ignored, this Court concludes that Section 1322(b)(1) is ultimately intended as a creditor protection device.

tion.

As already indicated, Opinion at 237ff. is bottomed on the assumption that the "unfair discrimination" standard is to be tested solely from the standpoint of the debtors. And Judge Wedoff has persuaded some others to that view (see, e.g., *Boggan,* 125 B.R. at 534). That reading is driven by the contention that the right to discriminate among classes of creditors was granted by Congress to provide an incentive for debtors to choose Chapter 13 plans. over Chapter 7 liquidations. Here is Opinion at 238–39:

> Chapter XIII of the former Bankruptcy Act required a debtor to pay all unsecured claims without classification, and hence pro rata, just as such claims are now paid in Chapter 7 (pursuant to Section 726(b)). During the hearings on the Bankruptcy Code, Congress received testimony that this lack of flexibility was a "substantial hindrance" to the use of Chapter XIII, because debtors would not voluntarily choose to make pro rata payments on debt they believed required special treatment. *Bankruptcy Act Revision: Hearings on H.R. 31 and H.R. 32 Before the Subcomm. on Civil and Constitutional Rights of the Comm. on the Judiciary, House of Representatives,* 94th Cong., 1st Sess. 1425–26 (1976) (statement of Claude Rice), reprinted in 5 Resnick & Wypyski, Bankruptcy Reform Act of 1978: A Legislative History (1979).... Put simply, Section 1322(b)(1) encourages debtors to employ Chapter 13 by allowing them to pay different amounts to different unsecured creditors, an option they would not possess in Chapter 7.

Admittedly that argument has some appeal (see also 5 Collier § 1322.01, at 1322–3 (expansion of the use of Chapter 13 is a congressional goal)). But that effort to draw an inference from a generalized congressional intent really ignores both the actual statutory language of Section 1322(b)(1) and the full implications of that language. Judge Wedoff has drawn an inference as to legislative in-

tent that cannot be supported by the available evidence.

Begin with the language of the statute itself—the normal place to commence any search for the meaning of a statute.[10] Judge Wedoff stresses Congress' use of "discriminate unfairly," essentially glossing over the rest of the statutory phrase. "Discriminate unfairly" against whom? "Discriminate unfairly *against any class* [of unsecured claims]"! With no disrespect meant to Judge Wedoff's effort, which is plainly a studious attempt to ascertain the congressional purpose, his omission of the key statutory language from that effort has much the same effect as the conjurer's byplay with his or her left hand to shift attention from what the right hand is doing—the classic sleight of hand diversion. There is no gainsaying the fact that the normal meaning of "unfairly against any class" measures the unfairness of the difference in treatment ("discriminat[ion]") in terms of unfairness to the *victim* ("against any class"), rather than unfairness to the person who elects to impose the discriminatory treatment.

■ Indeed, there is much to be said for a position that the *only* perspective from which the unfairness of a proposed differential in treatment should be evaluated is that of the disfavored class or classes of unsecured claimants. After all, the drafter of the plan decides whom to favor and whom not to favor in the first instance. Educated self-interest can thus be counted on to avoid any proposal that would operate "unfairly" against the drafter. And so a court's concern, in implementing what has been stated by Congress, should focus on whether the proposal deals unfairly as to the discriminated-against creditor class or classes.

It is perhaps needless to add that the just-announced reading is scarcely that of this Court alone. Thus *Smalberger,* 157 B.R. at 475 has similarly concluded:

---

**10.** Justice Stevens has spoken (with the proper degree of satire) of the opposite school of statutory construction, which begins with the legislative history and, only if it proves ambiguous, may then resort to how the statute reads. Though this Court has been unsuccessful in tracking down that trenchant criticism, its thought has

more recently been echoed in *Haitian Centers Council, Inc. v. McNary,* 969 F.2d 1350, 1366 (2d Cir.1992) ("even if we were to turn statutory construction on its head, and look to the words of the statute only when the legislative history is unclear").

From the language of § 1322(b)(1), it is apparent that the court should consider the proposed classification from the viewpoint of the creditors who are discriminated against. If it can be said that such classification is "unfair" to them, it should not be permitted.

Accord, such cases as *In re Scheiber*, 129 B.R. 604, 606 (Bankr.D.Minn.1991). Nor does such a perspective deprive debtors of an appropriate degree of protection. Not only can they employ some "fair" discriminatory classifications, but they may avail themselves of the escape valve in Section 523(a)(8)(A) and (B) that makes student loan obligations fully dischargeable under Chapter 13 either where those obligations first came due more than seven years before bankruptcy filing or where nondischargeability would "impose an undue hardship on the debtor [or] the debtor's dependents" (see n. 4; *Smalberger*, 157 B.R. at 476).

What has been said up to now might well end, as well as begin, the discussion. But to avoid any suspicion that a search beyond the statutory language might call for a different conclusion,[11] this opinion will go on to examine what else may be said in favor of and in opposition to the approach espoused in the Opinion.

For one thing, the construction adopted here is also consonant with the limited relevant legislative history, although it must be acknowledged that courts have long been frustrated by the dearth of direct guidance on interpreting the unfairness standard. To quote again from *Smalberger*, 157 B.R. at 475:

The legislative history to § 1322(b)(1) does not specify the grounds upon which a court should determine whether a proposed classification is unfair.

To thicken the fog, Congress also declined to shed any light on its decision to make student loans nondischargeable: In 1990 it amended Section 1328(a) to restrict dischargeability of certain student loans, criminal restitution debts and debts arising out of drunken driving, but "[t]he legislative history surrounding these amendments does not specify the reason for the inclusion of student loans in the amendments" (*id.* at 475).[12] In the absence of any direct statements in the legislative history, this Court will examine some other nonstatutory clues as to the legislative intent.

First, if Congress had intended debtors to be able to prefer the holders of their student loan obligations at the expense of other creditors, it could have done so explicitly by granting a statutory priority—as it did, for example, for certain administrative expenses (Section 507(a)(1)), for certain taxes (Section 507(a)(7)(A) through (G)) and for unsecured claims based on commitments by Debtors to the FDIC, the RTC or the Board of Governors of the Federal Reserve System (Section 507(a)(8)). As *In re Colfer*, 159 B.R. 602, 609 (Bankr.D.Me.1993) has said:

As to educational loans specifically, if Congress had intended to give educational loan obligations a distributional priority, it could have ... by including them in the list of statutory priorities.

Accord, *Smalberger*, 157 B.R. at 476.[13] To put the same point a bit differently, if Con-

---

**11.** Such a suspicion would be met by Justice Scalia with a resounding "so what?"—see, e.g., his concurring opinion in *United States v. Thompson/Center Arms Co.*, — U.S. —, —, 112 S.Ct. 2102, 2111, 119 L.Ed.2d 308 (1992), where he refers to "that last hope of lost interpretive causes, that St. Jude of the hagiology of statutory construction, legislative history." But because Justice Scalia's total disdain for nonstatutory aids to statutory construction is a decidedly minority view, the text discussion will continue.

**12.** Perhaps the only direct insight available concerns Section 1122, which was said to "codif[y] current case law surrounding the classification of claims ..." (H.R.Rep. No. 595, 95th Cong., 1st Sess. 406 (1977), U.S.Code Cong. & Admin.News

at 5787, 6362). That, however, really helps not at all.

**13.** Another (and related) indication that Congress did not intend to permit the type of discrimination that the Opinion contemplates is the fact that Congress could have so specified *directly* in Section 1322(b)(1), just as it did for cosigned loans ("such plan may treat claims for a consumer debt of the debtor if an individual is liable on such consumer debt with the debtor differently than other unsecured claims"). *Chapman*, 146 B.R. at 416 makes that point:

§ 1322, by specifically allowing cosigned consumer debts and small claims to be classified and treated separately from other unsecured

gress had desired to afford student loans special emphasis in terms of repayment, it has itself demonstrated that it certainly knew how to do so. Thus the familiar doctrine of *inclusio unius exclusio alterius* also buttresses the conclusion that Congress did not intend to permit the type of discriminatory manipulation by debtors sanctioned by the Opinion.

But perhaps the most telling piece of evidence in that direction actually derives from Congress' affirmative decision to withdraw student loans from Chapter 13 discharge. It must be remembered that the very congressional decision that rendered student loans *nondischargeable* in Chapter 13 proceedings reflected Congress' policy decision that *excluded* such debts from a pure fresh-start analysis: Congress has expressly decided that a debtor who has not paid off 100% of those loans will *not* emerge from Chapter 13 washed clean of the indebtedness. It is thus ironic (to say the least) to point to the generalized bankruptcy goal of a fresh start as the claimed "justification" for a plan that is skewed in favor of paying debts that will have to be paid in all events, whatever the plan might provide. *Colfer*, 159 B.R. at 610 puts the matter simply:

> Congress has made the call. The courts should not approve as "fair" discriminatory classification schemes "needed" only for the purpose of mitigating the consequences of statutory discharge exceptions.

Accord, like statements in such cases as *Saulter*, 133 B.R. at 149 and *Tucker*, 150 B.R. at 205.

And what can be said in opposition to all this? This Court does not mean to give the impression that Judge Wedoff has simply announced a result, without any effort to develop a reasoned justification. To the contrary, the Opinion reflects a sincere and scholarly attempt to develop a rationale in support of the conclusion reached there. But in essence Judge Wedoff's solely debtor-oriented inquiry proves too much. By its reasoning, *any* classification that worked to the benefit of the debtor could be justified on the

grounds that it encouraged debtors to opt for Chapter 13 over Chapter 7. As Judge Ginsberg said in *Chapman*, 146 B.R. at 419:

> Judge Wedoff's definition of fairness would sanction virtually any Chapter 13 plan that provided preferential treatment for debts nondischargeable in a Chapter 13 case.

In response to that critique, Judge Wedoff contends that the definition he proposes does in fact contain limits. For example, Opinion at 239 states (but without any explanation) that preferential treatment "plainly" cannot be used "to penalize certain creditors for purely subjective reasons," nor may debtors "propos[e] to pay friends and family members more than commercial creditors on the basis of personal affection." It is not at all clear, however, why that should be so under Judge Wedoff's reading of the legislative history. After all, permitting those concededly more troublesome types of discrimination would encourage the use of Chapter 13 in precisely the same way and to precisely the same extent as permitting other more palatable discriminatory classifications—if not more so. And the Opinion's failure to address that weakness in its theory substantially undermines the notion that Congress intended to permit preferential treatment in such a generous fashion.

In an attempt to set some boundaries as to what interests can give rise to fair discrimination under a best-interests-of-the-debtor test, Opinion at 240 states:

> [I]f the debtor can point to an objective benefit to be obtained or harm to be avoided by the discrimination, consistent with the purposes of Chapter 13, the debtor's interests should be recognized as legitimate. Here, the debtor's interest is in emerging from bankruptcy free of debt, with a "fresh start."

There are several problems with that assertion. First, although it is phrased much like a hornbook rule of law, the asserted "objective benefit" test of a "legitimate interest" really comes out of right field, without any supplementary explanation or roots in the legislative history (to say nothing of the stat-

---

claims without regard to unfair discrimination, apparently does not allow any other kinds of unsecured claims, including student loans, to

be classified and treated differently than other unsecured claims unless such discrimination is fair.

ute itself). And quite aside from the fact that the test has no such roots, it suffers from the purely conclusory nature of its key ingredient: "legitimate" interests. Though Judge Wedoff says that the debtor's interest in securing a fresh start would satisfy that vague test, the unsupported character of that statement only serves to demonstrate the value-laden nature of the standard. As *Colfer*, 159 B.R. at 609–10 (footnote omitted) states:

> Reliance on idealized notions of "fresh start," divorced from the very statute that provides that fresh start, is inappropriate. Congress has created, defined and limited the fresh start through, *inter alia*, the Code's discharge provisions. Surely the bankruptcy laws do effect a fresh start policy. But the same laws significantly limit the fresh start's scope.

At its most basic level, then, Judge Wedoff's pliant low threshold test represents not much more than a personal judgment that students should legitimately be able to discharge their nondischargeable student loans. And this opinion has already explained that the "fresh start" concept actually cuts the other way, given Congress' decision to exclude student loan debts from any guaranteed fresh start by making them nondischargeable. In final refutation of that approach, it is worth quoting at some length from Judge Ginsberg's opinion to the contrary in *Chapman*, 146 B.R. at 418–19:

> If this court allowed the debtor to pay the nondischargeable student loan debt in full while paying the general unsecured claims 10%, the court would, in effect, allow the debtor to obtain the result he seeks not by granting priority to the student loan claims but by reducing the priority of the rest of the unsecured claims, i.e., the dischargeable unsecured claims, to the extent of 90% of their claims. What the debtor would be doing is equitably subordinating 90% of the claims of those creditors holding dischargeable claims to the nondischargeable student loans.

\* \* \* \* \* \*

It hardly seems to be an appropriate use of equity to allow the debtor to force the holders of dischargeable claims, who are guilty of nothing more than bad judgment in giving the debtor credit, to fund his education; yet that is the actual result if the debtor is able to subordinate the claims of the holders of dischargeable claims against him to those of his student loan creditors.

The fact that Congress made student loan obligations nondischargeable in 1990 supports this conclusion. When Congress amended the Bankruptcy Code in 1990 and made student loans nondischargeable under § 523(a)(8), Congress could have amended § 1322 of the Bankruptcy Code by providing for special classification and treatment of student loans, as it did with cosigned consumer debts in 1984, or Congress could have made payment of student loans a priority in Chapter 13. Congress chose to do neither, leading this court to conclude that student loans are not to be favored in a Chapter 13 plan.

\* \* \* \* \* \*

Judge Wedoff's definition of fairness would sanction virtually any Chapter 13 plan that provided preferential treatment for debts nondischargeable in a Chapter 13 case. After all, it would always be in the debtor's best interests to pay as much as possible in his Chapter 13 plan to those creditors holding claims nondischargeable in Chapter 13. The debtor's interest is clearly best served by emerging from Chapter 13 with as small a debt load as possible. However, the *Lawson* approach [14] overlooks the fact that the concept of unfair discrimination as set forth in § 1322 is a creditor protection device.

### Are These Plans "Unfair"?

Judicial opinions are not law review articles. Judicial writers most often go astray (and lead litigants astray) when they seek to deal with issues that go beyond what is necessary to decide the case at hand—the source of potential mischief that carries the label of "dictum." This case poses special

---

14. [Footnote by this Court] As indicated earlier, the Opinion echoes (though at greater length) the analysis and conclusion earlier announced by Judge Wedoff in *Lawson*.

risks in that respect: Congress' use of the phrase "discriminate unfairly against any class" of unsecured claims, without so much as a hint as to the criteria by which to test the "unfairly" concept, tells us that Orwell's *Animal Farm* is at work here (some discriminations are more equal—or rather more unequal—than others), but it offers no clue to a principled definition by which to judge all plans that debtors may seek to devise, to see which of them may discriminate "fairly" rather than "unfairly."

This Court therefore cheerfully rejects any temptation to formulate a universal standard by which to measure all future class-discriminatory plans. Instead it cabins this decision in terms of the plans that are at issue here.

For that purpose the key factor must be the 1990 decision by Congress to eliminate the preexisting availability of Chapter 13 as a vehicle to avoid further responsibility for student loans. Even the title of that amendment—the Student Loan Default Prevention Initiative Act—manifested a policy decision to prevent those who had obtained an education (thus presumably enhancing their future earning power) through government loans or nonprofit institutional loans from shifting the burden of those loans to the government [15] or to the lending institution.[16] And that policy is really underscored by the two limited exceptions that Congress simultaneously created in the same statute, including the provision in Section 523(a)(8)(B) under which an otherwise nondischargeable student loan debt can become dischargeable if the alternative would result in "an undue hardship on the debtor and the debtor's dependents."

Debtors here seek to undercut that policy decision. By creating a widely disparate treatment for other unsecured claims vis-a-vis their student loans, they are indeed choosing to shift part of the burden for payment of their student loans: not to taxpayers generally or to the lending institutions or other prospective loan recipients, but to their other unsecured creditors. Absent such disparate treatment, Debtors would emerge from full compliance with their Chapter 13 plans with a portion of their student loans still unpaid. Nondischargeability of those loans, as Congress has mandated, would still require them to be paid in the future. But by introducing an inequality of payment into their Chapter 13 plans, Debtors would eliminate that future obligation at the expense of their underpaid other creditors.

 It is unnecessary to go beyond that point to resolve this appeal. There may well be factors that would not satisfy the Section 523(a)(8)(B) standard for the full dischargeability of student loan debt, but could yet justify some discriminatorily favorable treatment of such debts.[17] But no such factor has been identified by any Debtor in this case, and of course it is the burden of a Chapter 13 plan's proponent to demonstrate by a preponderance of the evidence that his or her plan meets the Code's requirements for confirmation (*Colfer*, 159 B.R. at 608; *Christophe*, 151 B.R. at 481; *Chapman*, 146 B.R. at 417). That burden has not been satisfied here, and that spells defeat for Debtors.

Before this opinion concludes, it may be worth spending a moment or two on a matter that some courts have viewed as relevant in reaching the same result as Judge Wedoff: the unfettered and nonwaivable Section 1307(a) right of every debtor to convert a Chapter 13 filing to a straight Chapter 7 bankruptcy at any time, in which event the required liquidation might generate no recovery for *any* unsecured creditor (student loan or otherwise). That has led to a few cases, beginning with *In re Sutherland*, 3 B.R. 420 (W.D.Ark.1980), that take an approach under which "any claim that would receive zero in a Chapter 7 proceeding is subject to any manner of classification, no matter how ridicu-

---

**15.** For "government," read taxpayers generally.

**16.** For "lending institution," read (1) those who contribute to the support of the nonprofit institution or (2) in the case of a revolving fund, other deserving students who are thus deprived of a source from which *they* might secure such loans.

**17.** To draw an example from the case law, it might be said that such a description would cover a situation in which the current payment of student loans would be necessary in order to permit the student to return to school and earn a degree (*In re Freshley*, 69 B.R. 96, 97–98 (Bankr. N.D.Ga.1987)).

lous" (J. McLaughlin, *Classification of Unsecured Claims in Chapter 13 of the Bankruptcy Reform Act of 1978: What is Fair?*, 7 Campbell L.Rev. 329 (1985)). Thus *Tucker*, 159 B.R. at 329—after pointing out that if the debtor converted to Chapter 7 creditors would collect virtually nothing after administrative expenses, even losing their access to post-petition earnings that might have accrued under Chapter 13—said:

> This Court, looking at the facts on a case-by-case basis, deems such a liquidation analysis highly significant. If this case is converted to a Chapter 7 case, the unsecured creditors will receive nothing and have their claims discharged. If the Plan is confirmed they will receive 29% of their claims. The fairer treatment for the creditors is clearly the 29% dividend in Chapter 13, which Congress encourages Debtors to use in lieu of Chapter 7.

That approach is unpersuasive for more than one reason. Like one of the arguments dealt with earlier, it proves too much. *Sutherland*, 3 B.R. at 422 posed its logical consequences in the starkest of terms:

> Under circumstances like these [where creditors are not legally entitled to receive anything], this Court would allow a classification for unsecured creditors whose credit managers have red-headed secretaries. Who would be hurt? Maybe some creditors could meet this test and, if so, at least that creditor would be paid.

Even the staunchest advocates of Judge Wedoff's position (except perhaps for the judicial author of *Sutherland*) would most likely view that announced hypothetical as *unfairly* discriminatory.

But that may be viewed as merely the statement of a result. More to the point, it is a total non sequitur to move from the premise that *all* unsecured creditors may recover nothing in a Chapter 7 liquidation (so that none of them has a "right" to receive anything specific) to the conclusion that they may "therefore" sustain sharply different treatment—some of them receiving a greater percentage and some receiving a lesser percentage of their debts—if the debtor chooses to follow a different path under the Code. Chapter 13 carries with it some perceived advantages and some perceived disadvantages in comparison with straight bankruptcy under Chapter 7. What a debtor may not do, consistently with the structure that Congress has created, is to pick and choose among the available options in a way that takes the advantages of one while avoiding the costs that Congress has attached to those advantages. *Groves*, 160 B.R. at 124 had it right:

> If the appropriate legal analysis yields the conclusion that the debtors' plans classify student loan debts discriminatorily in violation of § 1322(b)(1), it is irrelevant whether or not there exists an undesirable end-run around such a ruling.

Nor does this Court find itself persuaded by any parallel sought to be drawn between the current situation and the cases that have approved preferential treatment for a Chapter 13 debtor's obligations to provide child support (see *Leser*, 939 F.2d at 672)—*Colfer*, 159 B.R. at 610–11 makes much the same point. This Court instead agrees with such cases as *Groves*, 160 B.R. at 123 and *Scheiber*, 129 B.R. at 606 that have declined to extend that public policy analogy to the student loan situation, given the nature of the 1990 statutory change that Congress made as to student loans under Chapter 13.

In sum, this Court has found that in dealing with the preferential treatment of student loans in the Chapter 13 context, the frequently used four-factor test serves more as a vehicle for stating a result than as the source of a principled analysis as to why that result should obtain. And the unfortunate manner in which Congress has failed to define the concept of "discriminate unfairly" in evaluating such preferential treatment prevents any other development of such a principled analysis.

But all of that having been said, what remains clear is that no Chapter 13 plan can be approved that treats unpaid student loans more favorably than other unsecured debts solely because they *are* student loans. If a plan affording such preferential treatment is to survive scrutiny under the statutory "discriminate unfairly" test, the debtor must place something material onto the scales to

show a correlative benefit to the other unsecured creditors—and Debtors have proffered nothing of that nature here.

## Conclusion

What Judge Wedoff approved in the Opinion were plans that in each case discriminated unfairly against all of the Debtors' unsecured creditors except the holders of unpaid and unsecured secured loans. As Judge Ginsberg said under like circumstances in *Chapman*, 146 B.R. at 419:

Clearly, from the point of view of those creditors who are to be paid 10% of what they are owed under the debtor's proposed plan, the discrimination is neither fair nor reasonable. They are to be paid less than they would otherwise be paid under the plan because of the accident that the debtor happens to have nondischargeable student loans he would like to pay in full in his Chapter 13 case so he will not have to pay any unpaid balance on his student loans after completing his Chapter 13 plan. See § 1328.

Only the debtor derives benefit from the proposed discrimination. Since the debtor already has received the education funded by the student loans, the other creditors do not get any benefit from the discriminatory payments such as enhancement of the likelihood of success in completing the plan due to improvement in career skills and qualifications. Here there is no balancing of relative benefits allocated to the debtor and creditors from the proposed discrimination. Instead, the scales are tipped entirely in favor of the debtor. On the facts of this case, the proposed discrimination is unreasonable in that it benefits only the debtor at the expense of the creditors.

Accordingly the order of the Bankruptcy Court approving the Debtors' Chapter 13 plans is reversed, and each of the four cases is remanded to the Bankruptcy Court for further proceedings consistent with this opinion.

## APPENDIX

This Court has located the following list of reported cases that have decided whether or not to confirm Chapter 13 plans that propose to pay student loan creditors in full and other unsecured creditors at less than 100%. Although this Court is loath to claim that the list is exhaustive (and although new cases certainly appear on a regular basis), there is no question that the list fairly reflects the fact that Judge Wedoff's Opinion now under review represents a distinctly minority view.

| Case | To Student Loan Creditors | To Other Creditors | Decision |
|---|---|---|---|
| *Groves v. LaBarge*, 160 B.R. 121 (Bankr.E.D.Mo.1993) | 100% | 10–40% | unfair |
| *In re Benner*, 156 B.R. 631 (Bankr.D.Minn.1993) | 100% | 19% | unfair |
| *In re Boggan*, 125 B.R. 533 (Bankr.N.D.Ill.1991) | 100% | 15% | fair |
| *In re Chapman*, 146 B.R. 411 (Bankr.N.D.Ill.1992) | 100% | 10% | unfair |
| *In re Christophe*, 151 B.R. 475 (Bankr.N.D.Ill.1993) | 100% | 37% | unfair |
| *In re Colfer*, 159 B.R. 602 (Bankr.D.Me.1993) | 100% | 10.22% | unfair |
| *In re Dodds*, 140 B.R. 542 (Bankr.D.Mont.1992) | 100% | 79% | fair * |
| *In re Eitemiller*, 149 B.R. 626 (Bankr.D.Idaho 1993) | 73% | .01% ** | unfair |
| *In re Foreman*, 136 B.R. 532 (Bankr.S.D.Iowa 1992) | 100% | 100% | fair *** |

* *Dodds* actually involved a plan in which the student loan was to be paid in full according to its terms (a 54–month payout) *outside* of the plan, while the 36–month plan dealt only with the scheduled payment of other unsecured debts.

** In fact the *Eitemiller* plan would have given each unsecured creditor (except for the $73,000 payment on the $100,000 student loan) a $10 payment! That came to .01% for the objecting husband-and-wife creditors, whose $11,000 obligation represented 75% of the discriminated-against class.

*** *Foreman* held only that the payment of student loan obligations concurrently with secured claims and before payment of the remaining unsecured claims (although all unsecured creditors would eventually receive 100%) was not unfair discrimination.

519

| Case | To Student Loan Creditors | To Other Creditors | Decision |
|------|------|------|------|
| *In re Keel,* 143 B.R. 915 (Bankr.D.Neb.1992) | 100% | 0% | unfair |
| *In re Lewman,* 157 B.R. 134 (Bankr.S.D.Ind.1992) | 100% | 10% | unfair |
| *In re Saulter,* 133 B.R. 148 (Bankr.W.D.Mo.1991) | 100% | 10% | unfair |
| *In re Scheiber,* 129 B.R. 604 (Bankr.D.Minn.1991) | 100% | 3.5% | unfair |
| *In re Smalberger,* 157 B.R. 472 (Bankr.D.Or.1993) | 100% | 0% | unfair |
| *In re Tucker,* 130 B.R. 71 (Bankr.S.D.Iowa 1991) | 100% | 0% | unfair |
| *In re Tucker,* 159 B.R. 325 (Bankr.D.Mont.1993) | 100% | 29% | fair |
| *In re Tucker,* 150 B.R. 203 (Bankr.N.D.Ohio 1992) | 100% | 5% | unfair |