**In re William BENTLEY and Kara Bentley, Debtors.**

**William Bentley and Kara Bentley, Appellants,**

v.

**John Boyajian, Trustee, Appellee.**

**No. RI 00–109.**

United States Bankruptcy Appellate Panel of the First Circuit.

Sept. 5, 2001.

Peter G. Berman and Raskin & Berman, Providence, RI, on brief for the Appellants.

John Boyajian and Boyajian, Harrington & Richardson, Providence, RI, on brief for the Appellees.

Before KENNER, FEENEY, BOROFF, U.S. Bankruptcy Appellate Panel Judges.

PER CURIAM.

## I. INTRODUCTION

In their Chapter 13 plan, the Debtors proposed to pay their nondischargeable student loan obligations in full but to pay all other nonpriority unsecured claims—all of which were eligible to be discharged upon completion of the plan payments—a dividend of only three percent. The Debtors argued that such disparate treatment was justified by their desire to emerge from bankruptcy free of all prepetition debt. Upon objection by the Chapter 13 Trustee, the bankruptcy court disagreed and denied confirmation of the plan on the basis that it discriminated unfairly between the two classes of unsecured claims, in contravention of 11 U.S.C. § 1322(b)(1). For the reasons set forth below, we affirm.

## II. BACKGROUND

The Debtors, William and Kara Bentley, who filed a joint petition for relief under Chapter 13 of the Bankruptcy Code on December 1, 2000, filed a Chapter 13 plan that, in relevant part, divided nonpriority unsecured creditors into two classes and proposed to treat them quite differently. The first of the two classes was comprised solely of creditors holding student loan obligations that, by operation of § 1328(a)(2) of the Bankruptcy Code, would be excepted from discharge in Chapter 13.[1] The claims in this class to-

taled $57,727.95, and the plan proposed to pay them in full over the life of the plan. The second class consisted of all other unsecured claims, totaling (according to the Debtors' schedules) approximately $55,000. The plan proposed to pay creditors in this class a total of $2,000, to be shared among them on a *pro rata* basis, yielding a dividend of 3.6 percent. The plan proposed to fund these and all other dividends with monthly payments from their future earnings over a period of sixty months.

The Chapter 13 Trustee, John Boyajian, objected to the plan on two grounds: that the plan did not provide for all the Debtors' projected disposable income received in the three-year period following confirmation to be paid into the plan, as required by 11 U.S.C. § 1325(b)(1)(B); and that the plan unfairly discriminated against the class of general unsecured creditors in contravention of 11 U.S.C. § 1322(b)(1). The Trustee and the Debtors resolved the first objection by agreement: the Debtors would increase their proposed monthly plan payments such that the total of all payments over sixty months would equal their projected disposable income for the three-year period following confirmation.[2] After a short, non-evidentiary hearing on confirmation of the plan, the bankruptcy judge took the "unfair discrimination" objection under advisement and, by order of July 10, 2000, denied confirmation of the plan.

In its memorandum of decision, the bankruptcy court stated that the Debtors had the burden of proving that the proposed classification of creditors, with the resulting disparity of treatment, does not discriminate unfairly, and that the deter-

---

1. See 11 U.S.C. § 1328(a)(2) and 523(a)(8).

2. This increase was modest and did not substantially narrow the disparity in treatment between the two classes of nonpriority unsecured claims.

mination should be based on the totality of the circumstances, including balancing the relative benefits to the debtor and creditors from the proposed discrimination. The court went on to hold that the nondischargeability of student loans does not justify the preferential treatment of student loans over other unsecured debt; such disparity of treatment is unfair and violates both the letter and spirit of § 1322(b)(1).

Upon denial of confirmation, the court notified the Debtors that, in accordance with the court's local rules, they had eleven days to file an amended plan. Within ten days of the order denying confirmation, the Debtors moved to extend the time to file an amended plan or to seek leave of the Bankruptcy Appellate Panel to appeal from the interim order denying confirmation. At the hearing on this motion, the Debtors explained to the court that they did not wish to file an alternate plan but only to appeal from the order denying confirmation of the plan they had filed, and that the best way to put the matter in an appealable posture would be for the court simply to dismiss the case. Accordingly, on October 10, 2000, the court dismissed the case, whereupon the Debtors promptly appealed from the order denying confirmation of their plan.

### III. *ARGUMENTS ON APPEAL*

On appeal, the Debtors urge this Panel to adopt the minority position on unfair discrimination in favor of student loan creditors: discrimination against a class of creditors is fair and permissible under § 1322(b)(1) if and to the extent that it furthers an articulated, legitimate interest of the debtor; and a debtor's interest in emerging from bankruptcy free of nondischargeable student loan obligations, and thus with a fresh start, is legitimate. In addition, they argue, the discriminatory scheme they propose is consistent with the preferential treatment that (they contend) Congress itself prescribes by mandating priority treatment for student loans.

In response, the Chapter 13 Trustee stands principally on the reasons that the bankruptcy judge articulated in support of his decision. The Trustee adds only that the decision below should also be upheld for the further reason that the Debtors are capable of paying all claims in full during the course of a five-year Chapter 13 plan. They could do this, the Trustee contends, by devoting not only three years' disposable income to the plan (as their plan proposes) but a full five.

### IV. *JURISDICTION AND TIMELINESS*

 The Bankruptcy Appellate Panel has jurisdiction over this appeal, as an appeal from a final judgment of a bankruptcy judge, by virtue of 28 U.S.C. § 158(a)(1) and (c)(1). The order denying confirmation of the proposed Chapter 13 plan was not itself a final order because the Debtors remained free to propose an alternate plan (which, if confirmed, might have mooted the issues arising from the order now on appeal). *Lewis v. Farmers Home Admin.*, 992 F.2d 767, 772–74 (8th Cir.1993) (order denying confirmation of a Chapter 13 plan without dismissing the case is not a final order); *Simons v. Federal Deposit Ins. Corp. (In re Simons)*, 908 F.2d 643, 644–45 (10th Cir.1990) (same); *Maiorino v. Branford Savings Bank*, 691 F.2d 89, 91 (2d Cir.1982) (same); *In re Lievsay*, 118 F.3d 661, 662 (9th Cir.1997) (order denying confirmation of chapter 11 plan is interlocutory); but see *In re Bartee*, 212 F.3d 277, 282–84 (5th Cir.2000) ("In the case of a denial of confirmation of a plan, we look to whether or not the order was intended to serve as a final denial of the relief sought by the debtor"; because the record indicated that

court did not intend to conduct further proceedings and regarded the matter has having been finally resolved, the denial of confirmation of the Chapter 13 plan was deemed a final order). Even under the "flexible rule of finality" set forth in *Bartee*, the order denying confirmation in this case would be interlocutory, not final, because Judge Votolato's order denying confirmation clearly contemplated further proceedings—it specified the period within which the Debtors were to file an alternative plan—and therefore was not intended as a final denial of the relief sought by the Debtors. *In re Bartee*, 212 F.3d at 283 ("If the order was not intended to be final—for example, if the order addressed an issue that left the debtor able to file an amended plan (basically to try again)— appellate jurisdiction would be lacking."). The order became final when, upon being notified that the Debtors did not intend to seek confirmation of an alternate plan, the court dismissed their case.[3] Therefore, the Debtors' notice of appeal, filed within ten days of the order of dismissal, was a timely appeal from the order denying confirmation and, accordingly, we have jurisdiction over their appeal from that order. *Simons v. Federal Deposit Ins. Corp. (In re Simons)*, 908 F.2d at 645 (rejection of debtors' proposed plan may be considered on appeal from a final judgment dismissing the underlying petition or proceeding).

## V. STANDARD OF REVIEW

 We are asked in this appeal to review a determination that a provision in the Debtors' Chapter 13 plan "discriminates unfairly" against a class of unsecured creditors, in contravention of 11 U.S.C. § 1322(b)(1). The fairness of a discriminatory provision depends on the nature of the discrimination and the circumstances in which it is proposed. Because the determination requires a proper balancing of considerations that vary greatly from case to case, it is necessarily entrusted to the discretion of the bankruptcy judge and subject to review for abuse of discretion. "Abuse occurs when a material factor deserving significant weight is ignored, when an improper factor is relied upon, or when all proper and no improper factors are assessed, but the court makes a serious mistake in weighing them."[4] On appeal, the Debtors challenge only the judge's failure to consider or to give proper weight to one factor: their interest in emerging from Chapter 13 without further obligation on their nondischargeable student loans. The relevance and weight of this factor are issues of law, which we

3. We recognize that the order of dismissal was entered, in a sense, upon the Debtors' election, but the Debtors did not elect dismissal *per se;* rather, they elected only not to file an alternate plan, and the consequence of this election was dismissal of their case. This was not a voluntary dismissal under 11 U.S.C. § 1307(b) (chapter 13 case shall be dismissed upon debtor's request). The case was dismissed, and consequently the Debtors are before this panel, because the only relief that the Debtors sought in Chapter 13—to wit, confirmation of their plan—was denied. They could have filed an alternate plan, but they had no obligation to do so, and the preservation of their right to appeal as to the original plan was not contingent on their doing so. The election was not an abandonment or withdrawal by the Debtors of the plan whose confirmation was denied, or of their rights of appeal from that denial of confirmation; it does not render their appeal moot.

4. *Independent Oil & Chemical Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co.*, 864 F.2d 927, 929 (1st Cir.1988); *Ross–Simons of Warwick, Inc., v. Baccarat, Inc.*, 102 F.3d 12, 14 (1st Cir.1996) ("a finding of abuse usually entails proof that the nisi prius court, in making the challenged ruling, ignored pertinent elements deserving significant weight, considered improper criteria, or, though assessing all appropriate and no inappropriate factors, plainly erred in balancing them").

review *de novo*. *In re LaRoche*, 969 F.2d 1299, 1301 (1st Cir.1992). See *In re Groves*, 39 F.3d 212, 214 (8th Cir.1994) (application of "unfairly discriminates" standard may involve little more than exercise of discretion but, where court was required to determine whether nondischargeability of student loan justified discrimination against general unsecured creditors, the appeal presented primarily a question of statutory interpretation, to be reviewed *de novo* ).

## VI. *UNFAIR DISCRIMINATION*

### A. *The Chapter 13 Context*

■ In the normal course of a case under Chapter 13 of the Bankruptcy Code, a debtor obtains confirmation of, and then follows through on, a plan under which he or she makes payments over three to five years from disposable income on his or her prepetition debts. Though priority claims must be paid in full over the life of the plan, 11 U.S.C. § 1322(a)(2), plan payments usually need not and do not pay the nonpriority, unsecured debt in full. A plan can be confirmed despite its failure to pay all nonpriority unsecured claims in full if "the plan provides that all of the debtor's projected disposable income to be received in the three-year period beginning on the date that the first payment is due under the plan will be applied to make payments under the plan." 11 U.S.C. § 1325(b)(1)(B). So generally, upon completion of the plan payments, a balance remains owing on the debts paid through the plan, and as to this balance "the court shall grant the debtor a discharge." 11 U.S.C. § 1328(a).[5]

■ However, this Chapter 13 discharge is subject to exceptions—that is, some debts are excepted from discharge—and the exceptions create the dynamic that gives rise to this appeal. Nothing in the Bankruptcy Code requires that a nondischargeable debt, as such, be paid in full through a Chapter 13 plan. Rather, the only consequence of nondischargeability is that, to the extent the debt is not paid through the Chapter 13 plan, it must be paid after completion of the plan, or at least from a source other than the funds devoted to the plan.[6] Debtors therefore have incentive to direct their plan payments toward those debts that, to the extent not paid in bankruptcy, would survive it: the nondischargeable debts. By doing so they can minimize the total they must pay to free themselves, whether by discharge or by satisfaction, from the universe of prepetition debt. The strategy of many debtors will accordingly be to channel their plan payments first to the nondischargeable debt, to the extent necessary to pay it off, and to leave only the remainder, by comparison a much smaller dividend, for the dischargeable debt.

■ With respect to those nondischargeable obligations that also happen to

---

**5.** Section 1328(a) states:
(a) As soon as practicable after completion by the debtor of all payments under the plan, unless the court approves a written waiver of discharge executed by the debtor after the order for relief under this chapter, the court shall grant the debtor a discharge of all debts provided for by the plan or disallowed under section 502 of this title, except any debt—
(1) provided for under section 1322(b)(5) of this title;

(2) of the kind specified in paragraph (5), (8), or (9) of section 523(a) of this title; or
(3) for restitution, or a criminal fine, included in a sentence on the debtor's conviction of a crime.

**6.** This is not a requirement of bankruptcy law but simply of the underlying state or nonbankruptcy law that creates or enforces the obligation to pay.

be priority debts, the Bankruptcy Code requires that a Chapter 13 plan provide for exactly that treatment. This is because § 1322(a)(2) of the Code requires, as a condition of confirmation, that the plan provide for full payment of all claims entitled to priority. 11 U.S.C. § 1322(a)(2). But nondischargeability is not the same as priority. Priority gives a claim a better right to estate assets or plan payments—*i.e.*, to the funds distributed through bankruptcy—than is enjoyed by other unsecured claims. Nondischargeability, on the other hand, confers no priority as to estate assets; it merely causes a debt to survive the discharge, such that its holder can continue to collect it despite the discharge. Certain nondischargeable debts also happen to be priority claims, but only because the same debts appear on two lists: thus, in Chapter 13, spousal and child support obligations appear both on the list of priority claims, at 11 U.S.C. § 507(a)(7), and on the list of debts excepted from discharge, at 11 U.S.C. §§ 523(a)(5) and 1328(a)(2). But priority does not *per se* confer or entail nondischargeability; and nondischargeability does not *per se* confer or entail priority.

The nondischargeable debts at issue in this case, student loan obligations of the kind set forth in § 523(a)(8),[7] are not priority claims. Though the Code excepts debts of this kind from discharge in Chapter 13,[8] the Code neither grants them priority over other unsecured claims nor requires that they be paid in full. Hence the question now presented: may debtors nonetheless structure their Chapter 13 plans to prefer these debts over other unsecured debts, to provide that they be paid in full while other unsecureds get less or nothing at all?

Chapter 13 of the Bankruptcy Code answers this question with § 1322(b)(1): "the plan may designate a class or classes of unsecured claims, as provided in section 1122 of this title, but may not discriminate unfairly against any class so designated." 11 U.S.C. § 1322(b)(1). This section deals first with classification and then with discrimination among classes.

■ Classification is simply the grouping together of claims with respect to which the plan proposes a common treatment. 11 U.S.C. § 1322(a)(3) (if the plan classifies claims, it "shall provide the same treatment for each claim within a particular class"). Section 1322(b)(1) first permits a plan to designate "a class or classes of unsecured claims." It thus permits the debtor to separate unsecured claims into different classes and, except as provided in § 1122, places no limits on the debtor's ability to do so.[9]

---

7. Section 523(a)(8) excepts from discharge

any debt for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or non-profit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents.

11 U.S.C. § 523(a)(8).

8. 11 U.S.C. § 1328(a)(2) (excepting debts of a kind set forth in § 523(a)(8) from discharges granted under § 1328(a)).

9. Section 1122 contains two provisions, both incorporated by reference into § 1322(b)(1). The first limits the debtor's ability to group claims together: "Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such case." 11 U.S.C. § 1122(a). The second expressly permits separate classification of certain claims for administrative convenience: "A plan may designate a separate class of

 Discrimination among classes of creditors, on the other hand, *is* subject to limitation. The plan "may not discriminate unfairly against any class so designated." 11 U.S.C. § 1322(b)(1). Before determining what this phrase prohibits, we note first that it tacitly *permits* some measure of discrimination between different classes. In prohibiting only such discrimination as is unfair against any class, § 1322(b)(1) signals that a plan may, to an extent, treat different classes differently. So a plan may discriminate, but not unfairly.

We come now to the terms at the heart of this appeal. What does § 1322(b)(1) mean by "discriminate unfairly" against a class? Neither the phrase nor its component terms is defined in the Bankruptcy Code, the legislative history offers no insight into their meaning, and the Court of Appeals for this circuit has not addressed the issue.

### B. *"Discriminate"*

 Because § 1322(b)(1) distinguishes between discrimination that is unfair and discrimination that is not, we understand "discriminate" to have no pejorative connotation here. "To discriminate," in its broadest sense, is to make a distinction or to note a difference between two things.[10] Derivatively, it is to treat two things differently on account of a distinction between them.[11] Accordingly, in § 1322(b)(1), to discriminate is simply to treat two classes differently on the basis of a difference between them; the difference in treatment need not be unfair, wrongful, or even adverse to a class in order to constitute discrimination within the meaning of this statute. The treatment need only be different.[12]

### C. *"Unfairly"*

Section 1322(b)(1) prohibits only such discrimination as is unfair to any class of unsecured claims and, conversely, sanctions such differences in treatment as are fair. The operative term here is fair. Like good, just, and right, however, "fair" in the abstract is too indefinite, and therefore prohibitively difficult, to define and apply. The world is full of competing theories and perspectives from which to determine what is fair, and the word "fair," standing alone, does not specify which of them to apply. This problem has left the courts casting about for a definite standard of its meaning in this statute.

Among the many courts that have addressed the fairness of discrimination in favor of student loan creditors in Chapter 13 plans, most have seized upon a four-part test adopted by the Eighth Circuit Court of Appeals in *In re Leser*, 939 F.2d

---

claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience." 11 U.S.C. § 1122(b). Neither provision is at issue in this appeal.

10. "discriminate, *v.*" *Oxford English Dictionary*, Ed. J.A. Simpson and E.S.C. Weiner (2nd ed. Oxford: Clarendon Press, 1989), *OED Online*, Oxford University Press (13 March 2001) <http://dictionary.oed.com/cgi/entry/00065555> ("to discriminate" means to perceive, observe, or note the difference in or between things).

11. BLACK'S LAW DICTIONARY 479–80 (7th ed.1999) (discrimination, in its neutral, nonpejorative sense, means differential treatment).

12. Accordingly we reject any suggestion that, by virtue of the fact that it authorizes discrimination between classes, § 1322(b)(1) necessarily authorizes treatment that prefers one class over another. It may merely authorize differences that nonetheless result in equal treatment.

669 (8th Cir.1991): discrimination against a class of unsecured creditors is fair if (1) it has a "reasonable basis," which has come to mean simply that the discrimination furthers a legitimate interest of the debtor; (2) the debtor cannot carry out a plan without it; (3) the discrimination is proposed in good faith; and (4) the degree of discrimination is directly related to the basis or rationale for the discrimination. *Id.* at 672. This test has been used in many cases, but in very different ways and with wildly disparate results. It has been criticized for numerous shortcomings,[13] not least of which is that, insofar as the test relies upon abstract, undefined notions of "reasonableness," "legitimacy," and "good faith," it fails to direct the court's analysis and instead creates a vacuum that the court itself must fill.[14] The test prescribes no baseline from which to assess what is owing to a particular class, what departures are justified, and what compensation is owing (if any) on account of a particular departure. It offers no real direction for determining the fairness of discrimination in any given instance. Moreover, the test appears to be designed only to minimize discrimination—permitting only so much as is necessary to advance a debtor's interests—not, as § 1322(b)(1) requires, to identify and prevent such discrimination as is unfair.[15] For these and the reasons catalogued more fully in *Brown*, 162 B.R. at 509–15, *Leser* is not a useful starting point.

Based in part on these criticisms, some courts opted for an alternate test under which discrimination would be deemed fair if it furthered a legitimate interest of the debtor. The most elaborate defense of this position is articulated by Bankruptcy Judge Wedoff in his opinion in *In re Brown*, 152 B.R. 232, 244 (Bankr.N.D.Ill. 1993), *rev'd* 162 B.R. 506 (N.D.Ill.1993).[16] As he summarizes the position:

> debtors should be allowed to make preferential classifications when the resulting discrimination rationally furthers a legitimate interest of the debtors. In the cases now before the court, the debtors have a legitimate interest in paying their nondischargeable student loans in full through their Chapter 13 plans, so

**13.** See especially *McCullough v. Brown (In re Brown)*, 162 B.R. 506, 509–15 (N.D.Ill.1993); *In re Brown*, 152 B.R. 232, 235–37 (Bankr. N.D.Ill.1993) *rev'd on appeal*, 162 B.R. 506; and *In re Colfer*, 159 B.R. 602, 607–08 nn. 18 and 19 (Bankr.D.Me.1993).

**14.** As Judge Haines observed in *Colfer*,

> [f]raming the inquiry in terms of the "legitimate" interests of the debtor provides no surer mooring than the four-part test's abstract reference to "reasonableness" and is equally redundant of the general requirement that a Chapter 13 plan be proposed in good faith. Unless the "legitimacy" of the interests motivating the discrimination is determined by reference to pertinent provisions of the Code, the analysis can become a playground of judicial policymaking.

*In re Colfer*, 159 B.R. at 608 n. 18. Likewise Judge Shadur in *Brown*:

> As might be anticipated from its own lack of precision, the "reasonable basis" formulation is no more useful than the undefined statutory concept of "discriminate unfairly." In the end a judge who applies such an amorphous "test" wields a nearly unchecked discretion.

*McCullough v. Brown (In re Brown)*, 162 B.R. at 509.

**15.** This is not to say that courts employing the test have not decided their cases on the basis of considerations germane to fairness and to § 1322(b)(1). Our point is that they arrived at their considerations despite the test, not because of it.

**16.** See also *In re Willis*, 189 B.R. 203 (Bankr. N.D.Okl.1995) (Debtor has a legitimate interest in paying her nondischargeable student loans within the plan, and discrimination against other unsecured creditors is a reasonable means of accomplishing that.); and *In re Lawson*, 93 B.R. 979, 984 (Bankr.N.D.Ill. 1988).

that they may complete their plans free of debt. Accordingly, their plans do not unfairly discriminate by providing for full payment of student loans and proportionately smaller payments of other unsecured claims.

*In re Brown,* 152 B.R. at 244. Though *Brown* was reversed on appeal, it is precisely this position that the Debtors now urge us to adopt.

 We decline to do so. By asking whether a plan provision "rationally furthers a legitimate interest of the debtor," one determines only whether the provision is prudent, not whether it is fair. Fairness, in the sense plainly intended by § 1322(b)(1), is a matter of balancing correctly the interests *of two or more parties.* This is all the more evident when "unfairly" modifies "discriminate," an act that, of necessity, involves three parties: the debtor, the class preferred, and the class discriminated against. Lest there be any doubt that the affected classes should figure into this analysis, § 1322(b)(1) makes explicit that the plan "may not discriminate unfairly *against any class so designated.*" 11 U.S.C. § 1322(b)(1) (emphasis added); *In re Brown,* 162 B.R. at 512–13 ("[t]he normal meaning of 'unfairly against any class' measures the unfairness of the difference in treatment ... in terms of unfairness to the victim ('against any class'), rather than unfairness to the person who elects to impose the discriminatory treatment."). Thus fairness in § 1322(b)(1) requires consideration not solely of the debtor's interest but also of the interests of the affected classes. The standard of fairness that the Debtors now advocate fails to take account of the very interest that the statute expressly protects, and so we reject that standard, too, as the measure of fairness.[17]

Instead, we prefer the approach adopted in *Colfer,* in the appellate decision in *Brown,* and less explicitly in many other decisions, which is to look to Chapter 13 itself for what is normative, the baseline from which departures can be discerned, measured, and evaluated for fairness.[18] This approach is based on the supposition that, in using the standard of "fairness" that is implicit in § 1322(b)(1), Congress did not intend to leave courts with a notion so abstract as to supply no definite content or real guidance or to require each judge to define fairness according to his or her own lights: in effect, to improvise individual standards. Congress cannot have intended such a wholesale assignment to individual judges of a legislative function. Rather, we understand § 1322(b)(1) as mandating the standard of fairness that is implicit in Chapter 13, the context in which that term is used. *In re Colfer,* 159 B.R. at 608 & n. 20 (fairness of proposed discrimination requires analysis of "the impact of the discrimination on Congress' chosen statutory definition of the legitimate interests and expectations of parties-in-interest to Chapter 13 proceedings," including distributional priorities, fresh start, expressly permitted classifications, availability of subordination, extent of the estate, and amounts available for distribution under the plan).

---

**17.** Because we reject the proposition that discrimination is fair if it advances a legitimate interest of the debtor, we need not address the Debtors' further contention that a debtor's interest in emerging from bankruptcy free of nondischargeable student loan obligations, and thus with a fresh start, is "legitimate." However, as the discussion below should make clear, we do not view this interest as justifying unequal treatment in the circumstances of this case.

**18.** *In re Colfer,* 159 B.R. 602, 608–11 (Bankr. D.Me.1993); and *McCullough v. Brown (In re Brown),* 162 B.R. 506, 515–18 (N.D.Ill.1993).

■■■■■■ Accordingly, for the baseline against which to evaluate discriminatory provisions for fairness, we look to the principles and structure of Chapter 13 itself. (We identify and elaborate upon the relevant principles and structures below.) When a plan prescribes different treatment for two classes but, despite the differences, offers to each class benefits and burdens that are equivalent to those it would receive at the baseline, then the discrimination is fair. On the other hand, when the discrimination alters the allocation of benefits and burdens to the detriment of one class, the discrimination is unfair and prohibited.[19] In this instance, the guiding provisions and principles of Chapter 13 are four.

### 1. *Equality of Distribution*

The first is equality of distribution: absent an express grant of priority (as under § 507(a)) or cause for subordination under § 510(c), unsecured creditors should share equally in any dividend.[20] The First Circuit articulated this principle in a reorganization proceeding under Chapter XI of the former Bankruptcy Act, predecessor to the current Code. In holding that severance claims that arose entirely from prepetition service were not entitled to priority as costs of administration, the First Circuit stated:

We begin with the premise that the theme of the Bankruptcy Act is "equality of distribution." "If one claimant is to be preferred over others, the purpose should be clear from the statute." *Nathanson v. NLRB*, 344 U.S. 25, 29, 73 S.Ct. 80, 83, 97 L.Ed. 23 (1952); see *Sampsell v. Imperial Paper Corp.*, 313 U.S. 215, 219, 61 S.Ct. 904, 85 L.Ed. 1293 (1941). To give priority to a claimant not clearly entitled thereto is not only inconsistent with the policy of equality of distribution; it dilutes the value of the priority for those creditors Congress intended to prefer.

*In re Mammoth Mart, Inc.*, 536 F.2d 950, 953 (1st Cir.1976). The principle of equality of distribution has been carried forward as one of the guiding principles of the Bankruptcy Code. The principle is evident even in the section now at issue, in that § 1322(b)(1) places the burden on the debtor to justify as fair any difference in treatment among general unsecured creditors. As a general rule, then, fairness in Chapter 13 requires equality of distribution among nonpriority unsecured creditors, and the burden of justification is on those who propose plans to the contrary.

### 2. *Nonpriority of Student Loans*

Second, the Debtors' student loan obligations are not debts to which the Code grants priority. Student loan obligations

---

**19.** It is not clear whether there are factors outside the contemplation of Chapter 13 that might fairly justify departures from the baseline. None are offered or evident in this case, but we hesitate to conclude that the standard of fairness we propose is exhaustive and adequate to every manner of discrimination between classes.

**20.** *In re Colfer*, 159 B.R. at 609; *In re Sperna*, 173 B.R. 654, 659 (9th Cir. BAP 1994) (Congress could have but did not give priority to student loans, and their characteristics do not justify subordinating other unsecured claims to them); *In re Smalberger*, 157 B.R. 472, 476

(Bankr.D.Or.1993), *aff'd* 170 B.R. 707 (D.Or. 1994) ("The fact that Congress has not provided priority treatment for student loan debts either in § 507 or § 1322(b)(1) is some indication that Congress did not intend such debts to be ... given preferential treatment."); *In re Chapman*, 146 B.R. 411, 418–19 (Bankr.N.D.Ill.1992) (noting lack of statutory priority for student loans and absence of equitable basis for subordinating other unsecured debt); and *In re Chandler*, 210 B.R. 898, 902 (Bankr.D.N.H.1997) (in Bankruptcy Code, principle of equal treatment of creditors is as important as providing fresh start).

do not appear in the list of claims granted priority in § 507(a). They are indeed excepted from discharge, but, as we explained above, nondischargeability is not, and does not entail, priority as to any distribution in or through bankruptcy; it merely permits the holder to continue to enforce the debt after bankruptcy. Nor do the Debtors suggest that these claims are entitled priority, or payment in full, by virtue of any other provision of Chapter 13. Accordingly, as far as the Code is concerned, nothing in the nature of the claims at issue here warrants or justifies treating the student loans more favorably than the others.

### 3. Contributions: Mandatory v. Optional

Third, as a condition of plan confirmation, Chapter 13 requires that, if a debtor's plan does not propose to pay the full amount of each allowed unsecured claim, then the debtor must devote at least a certain quantum of property to the plan:

an amount equal to "all of the debtor's projected disposable income to be received in the three-year period beginning on the date that the first payment is due under the plan." 11 U.S.C. § 1325(b)(1).[21] Debtors may, in their discretion, devote more value to their plans, but they must devote at least this minimum, and, in fact, the Debtors in this case have proposed to submit only the minimum.[22] For those unsecured creditors whose claims are dischargeable, this minimum represents the only assured source of satisfaction for their claims. As to this minimum, fairness clearly gives these unsecured creditors an especially strong claim to an equal—which is to say *pro rata*—share. Sharing on a *pro rata* basis is fair as between the debtor and each unsecured creditor whose debt is dischargeable, because the creditor's *pro rata* share in the debtor's three years' of disposable income is, in the Chapter 13 scheme, the *quid pro quo* that the debtor must pay for the discharge of the balance of the creditor's claim.[23] And sharing on a

---

**21.** Section 1325(b)(1) states:

If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan—

(A) the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or

(B) the plan provides that all of the debtor's projected disposable income to be received in the three-year period beginning on the date that the first payment is due under the plan will be applied to make payments under the plan.

**22.** Their plan has a duration of five years but is funded with payments equal to only three years' disposable income.

**23.** Some cases suggest that the standard of comparison should be not what the dischargeable unsecured debts would get in a pro rata distribution of the mandatory contributions under Chapter 13. Instead, because debtors

have the option of filing under Chapter 7 instead of Chapter 13, a discriminatory plan is fair if it provides more to the dischargeable debts than would a distribution under Chapter 7, which in many cases is nothing. See, for example, *In re Tucker*, 159 B.R. 325, 329 (Bankr.D.Mont.1993). (We have no findings in this case on what the general unsecured creditors would get if this were a case under Chapter 7, but, insofar as we can determine from the Debtors' schedules, it appears that general unsecured creditors would get nothing in Chapter 7, and, for purposes of argument, we will proceed on that assumption.)

We think that using Chapter 7 as the standard of comparison amounts to comparing apples and oranges. Judge Shadur explained this well:

Chapter 13 carries with it some perceived advantages and some perceived disadvantages in comparison with straight bankruptcy under Chapter 7. What a debtor may not do, consistently with the structure that Congress has created, is to pick and choose among the available options in a way that

*pro rata* basis is fair as between those creditors whose debts are dischargeable and those whose are not, because, as we stated above, their claims are of equal priority. In fact, even with *pro rata* sharing, the nondischargeable claims still are treated better than the dischargeables because, by virtue of nondischargeability, they retain the right to collect their debts after bankruptcy,[24] an advantage the dischargeables do not share. An insistence on *pro rata* sharing does not cure this disparity but at least prevents the disparity from being further exacerbated. Certainly the fact that their claims are nondischargeable is not cause, as a matter of fairness between the two classes, to give them still more at the expense of those who begin with less.

### 4. *The Fresh Start*

Do the Debtors have an interest that might trump the creditors' strong claim to a *pro rata* sharing? The question brings us to the "fresh start" and its limits. The Debtors argue that discrimination in favor of student loan claims is justified by the purpose it would serve: to enable them to pay their student loans in full through the plan and then to emerge from bankruptcy free of those obligations, with a fresh start.

Without question, affording debtors a fresh start is one of the fundamental purposes of Chapter 13 and of the Bankruptcy Code in general. However, the fresh start is effectuated principally through the discharge of prepetition debt, and the discharge is not available as to all debt. More to the point, the student loans from which the present machinations are intended to provide a fresh start are debts that, except in instances of undue hardship, *Chapter 13 expressly excepts from discharge* (and this despite the fact that its exceptions from discharge are considerably fewer than in Chapter 7). 11 U.S.C. §§ 523(a)(8), 1328(a), and 727(b). In other words, Chapter 13 does not contemplate that a debtor will necessarily emerge from Chapter 13 entirely free of student loan obligations.[25] See *In re Colfer*, 159 B.R. at 607–08 ("Reliance on idealized notions of 'fresh start,' divorced from the very statute that provides the fresh start, is inappropriate."); *In re Sperna*, 173 B.R. at 659 ("[T]here is nothing in the code or case law that defines 'fresh start' as the emergence from bankruptcy completely free of all debt.").

### D. *Conclusion*

 When this exception from discharge is viewed with the other significant features of Chapter 13—the expectation that nonpriority unsecured creditors will share equally in the required plan contributions, and the fact that student loans are not accorded priority—what emerges is a

---

takes the advantages of one while avoiding the costs that Congress has attached to those advantages. [The case of *In re] Groves*, 160 B.R. [121] at 124 [(E.D.Mo. 1993)] had it right: "If the appropriate legal analysis yields the conclusion that the debtors' plans classify student loan debts discriminatorily in violation of § 1322(b)(1), it is irrelevant whether or not there exists an undesirable end-run around such a ruling."
*McCullough v. Brown (In re Brown)*, 162 B.R. at 517.

**24.** If anything, this would be cause to discriminate in favor of the dischargeable claims, to even the playing field, but debtors never propose to discriminate in that direction.

**25.** As to these obligations, Chapter 13 still provides a fresh start, but one that is more limited: part of the debt remains after bankruptcy, but the debtor is better able to service it because he or she is free of all dischargeable debt. Therefore, the choice here is not between a fresh start and no fresh start, but between fresh starts of different extent.

clear expectation in Chapter 13 that the balance due on nondischargeable student loans after bankruptcy (that is, after the student loan claims have shared on a *pro rata* basis with other general unsecured claims in the distribution funded by the Chapter 13 plan) must be paid by debtors out of assets that they need not contribute to the plan. In the balance of burdens and benefits that the Code establishes as a baseline, the postbankruptcy balance due on student loans should be paid by the Debtors out of assets that they are not required to commit to the plan, not by general unsecured creditors out of their share of the Debtor's minimum contribution. The Debtors' interest in a fresh start, in the sense of emerging from Chapter 13 without further obligation on their student loans, does not justify the discrimination here proposed, which, in essence, would foist upon the unsecured creditors a burden that Chapter 13 places on the Debtors themselves.

Where a plan redistributes benefits and burdens to the debtor's benefit and the unsecured creditors' detriment, as this one does, it can remain fair only if the debtor "plac[es] something material onto the scales to show a correlative benefit to the other unsecured creditors." *McCullough v. Brown*, 162 B.R. at 517–18. This plan offers no correlative benefit. It arrogates the unsecured creditors' dividend for the Debtors' benefit without compensation of

equivalent value (or any compensation at all). Therefore, we conclude that the plan discriminates unfairly [26] and AFFIRM the order denying its confirmation.

---

**26.** Because the first 36 months' disposable income is mandatory but further plan contributions are not, at least one court would prohibit discrimination in distribution of the first 36 months' disposable income but permit discrimination in favor of nondischargeable student loans with respect to any further contributions. *In re Strickland,* 181 B.R. 598 (Bankr.N.D.Ala.1995), whose holding is endorsed by Judge Lundin. See Keith M. Lundin, *Chapter 13 Bankruptcy,* at 153–9 to 153–11, and § 159.1 (3d ed.2000), citing D. Boshkoff, *Rethinking the Treatment of Unsecured*

*Claims in Chapter 13 Proceedings* (Apr.1993) (unpublished manuscript, Federal Judicial Center); but see *In re Sullivan,* 195 B.R. 649, 657 (Bankr.W.D.Tex.1996) (rejecting *Strickland*). Like the court in *Strickland,* we attach importance to the fact that the discrimination here involves the disposition of mandatory contributions. However, because this case involves no contributions beyond the mandatory minimum, we express no opinion on when and whether a plan may discriminate in the distribution of optional contributions.