**In re William Charles MASON, Jill Kathleen Mason, Debtors.**

**No. 02–12281.**

United States Bankruptcy Court, D. Kansas.

Sept. 30, 2003.

---

Laurie B. Williams, Wichita, KS, trustee.

Ryan Hodge, Ray, Hodge & Associates, L.L.C., Wichita, KS, for Debtors.

## MEMORANDUM OPINION

ROBERT E. NUGENT, Chief Judge.

The chapter 13 debtors William and Jill Mason propose in their Amended Plan to separately classify their nondischargeable, unsecured student loan obligations in the amount of $30,941.44 and to partially pay the student loan debt ahead of other general unsecured claims totaling $43,341.00. The chapter 13 trustee objects to confirmation of the debtors' Amended Plan, contending that this proposed classification and treatment unfairly discriminates against the class of general unsecured creditors in contravention of 11 U.S.C. § 1322(b)(1).[1]  For the reasons set forth below, the Court agrees with the trustee and denies confirmation of debtors' Amended Plan.

### Jurisdiction

This contested matter is a core proceeding of which the Court has jurisdiction.[2] It is submitted to the Court on stipulated facts and briefs.[3]  These papers and the Court's file comprise the only evidentiary record in this case.  Based thereon, the Court makes the following findings of fact and conclusions of law pursuant to Fed. R. Bankr.P. 7052.

### Findings of Fact

On May 16, 2002, the debtors William and Jill Mason ("debtors") filed their petition for bankruptcy relief under Chapter 13.  On this same date, debtors filed their chapter 13 plan.

On November 14, 2002, the debtors filed an Amended Plan wherein they proposed plan payments of $1,250 a month for a term of 56 months.[4]  The Amended Plan further provided as follows:

**Class C Claims:** Dividends to unsecured creditors whose claims are duly filed and allowed as follows:

a) The penalties and interest owed to Internal Revenue Service and or State of Kansas for the tax 1999 through 2001 tax years are unsecured, nonpriority debts and shall be fully discharged upon the completion and discharge of this Chapter 13 Plan.[5]

---

1. All statutory references are to the Bankruptcy Code, 11 U.S.C. § 101, et seq. unless otherwise specified.

2. 28 U.S.C. § 157(b)(1) and (b)(2)(L); Fed. R. Bankr.P. 9014.

3. See Dkt. 31 [stipulations], Dkt. 25 [debtors' brief] and Dkt. 32 [trustee's brief].

4. See Dkt. 18.  Class A claims include priority tax claims totaling $38,602.  Class B claims consist of the secured claim of Honda finance in the amount of $14,500.

5. Pursuant to the parties' stipulation, the debtors have agreed to further modify this provision to pay the pre-petition interest on the IRS and Kansas Department of Revenue claims as unsecured priority claims.  See Dkt. 31, ¶ 5.

b) Income tax owed to Internal Revenue Service or State of Kansas, including principal, penalties and interest for the 1998 tax year, or any prior year, is an un-secured [sic], non-priority claim and shall be fully discharged upon the completion and discharge of this Chapter 13 Plan.

c) **It is anticipated that there will be the sum of $5,660.00 remaining to be paid to unsecured creditors.[6] This sum constitutes approximately 8% of the Unsecured debt balance. This sum also represents 51% of funds paid in to Ms. Mason's retirement account.**

d) **Said funds referenced in paragraph c) above shall be paid first to the non-priority unsecured claims of the United States Department of Education then amongst other general unsecured creditors.**

[Emphasis added.]

The unsecured student loan obligations consist of the claim of Sallie Mae Servicing L.P. in the amount of $20,419.03 and the claims of Bank of America for three unsecured student loans in the amount of $10,522.41, for total student loan claims of $30,941.44. The amount of the general unsecured claims, exclusive of the student loan claims, total $43,341.00 as of the claim bar date. If the debtors make all of the payments proposed in the Amended Plan, the total distribution to the student loan creditors as proposed in the Amended Plan will be $5,202.91—the full amount available for unsecured creditors, or roughly 17% of the amount of the student loan claims.

The remaining general unsecured creditors would receive nothing on their claims.

If the student loan claims are paid pro rata with the other general unsecured claims, all of the unsecured creditors would receive a dividend of 7%.

Under either scenario, the student loan claims would not be paid in full at the completion of the Amended Plan. According to the stipulated plan calculations of the trustee, the Class C unsecured creditors would not receive any plan payments until the secured claims and priority claims are paid in full at month 52. Under the Amended Plan if the student loan claims are paid ahead of the other general unsecured claims, the remaining balance on the student loan claims upon completion of the plan payments would be $25,738.53. If the student loan claims were paid pro rata with the other general unsecured claims, the remaining balance on the student loan claims upon completion of the plan payments would be $29,428.78. In either event, the remaining balance on the student loan debt will be nondischargeable.[7]

*Conclusions of Law*

■ Section 1322(a)(3) requires that a chapter 13 plan provide the same treatment for each claim within a particular class. Section 1322(b)(1), which is subject to subsection (a), permits designation of a "a class or classes of unsecured claims" but prohibits a designation that "discriminate[s] unfairly" against any class of unsecured claims. The debtors have the burden of showing that their Amended Plan complies with the statutory requirements for confirmation and does not unfairly dis-

---

**6.** The parties have stipulated that the accurate figure that would be available for Class C claims is $5,202.91, rather than $5,660.00, assuming the debtors made all of the plan payments proposed. *See* Dkt. 31, ¶ 7. The slight discrepancy in the figures results from the amount of the priority tax claims as pro-

vided in the plan ($38,602) compared to the amount of the priority tax claims as shown in the proofs of claim ($39,139.79). *See* Ex. E and Ex. F attached to Stipulations.

**7.** 11 U.S.C. § 1328(a)(2) and § 523(a)(8).

criminate.[8] Here, the trustee objects to the provision in the Amended Plan that proposes to pay the student loan claims ahead of other general unsecured claims, contending that this provision runs afoul of § 1322(b)(1) and unfairly discriminates against the class of general unsecured creditors.

There is considerable dispute among reported decisions concerning the propriety of separately classifying and treating student loans.[9] Several tests have emerged from the case law for determining whether a separate classification and treatment of student loans unfairly discriminates against the class of general unsecured claims.

### The Four–Step Test

A "four step test" for determining whether separate classification of unsecured claims is fair was stated and applied by the Eighth Circuit Court of Appeals in

In re Leser,[10] a case involving separate classification of a nondischargeable child support claim. In that case, the debtor proposed to pay in full the nondischargeable debt and to pay 8% of other unsecured claims. The court described the relevant inquiries in the four-part test:

(1) whether the discrimination has a reasonable basis; (2) whether the debtor can carry out a plan without the discrimination; (3) whether the discrimination is proposed in good faith; and (4) whether the degree of discrimination is directly related to the basis or rationale for the discrimination.[11]

The bankruptcy courts have applied this four-part test in the context of separately classifying nondischargeable student loans.[12]

### The Balancing Test

A second test for determining whether a separate classification of student loan debt

---

**8.** *In re Groves,* 39 F.3d 212, 214 (8th Cir. 1994) (The proponent of chapter 13 plan has the burden of proving that proposed classification does not discriminate unfairly); *In re Janssen,* 220 B.R. 639, 643 (Bankr.N.D.Iowa 1998) (The debtor bears the burden of establishing the rationale and fairness of discriminatory treatment of unsecured claims.).

**9.** Neither the debtors nor the trustee has cited any authority from the Tenth Circuit Court of Appeals on this issue and this Court's independent research has uncovered none. There are, however, three reported cases from districts within the Tenth Circuit. *See e.g., In re Willis,* 197 B.R. 912 (N.D.Okla.1996) (Nondischargeability by itself is insufficient basis for preferential treatment of student loan over other unsecured debt); *In re Anderson,* 173 B.R. 226 (Bankr.D.Colo.1993) (Absent extraordinary or compelling circumstances. "fresh start" alone is not a reasonable basis for discriminating against unsecured creditors); *In re Taylor,* 137 B.R. 60 (Bankr. W.D.Okla.1992) (advocating a "bright line" test that would prohibit in a chapter 13 plan, any discrimination in favor of nondischargeable student loan obligations over other unsecured creditors). In all three cases, chapter

13 plans that proposed to pay nondischargeable student loans in full while paying a portion of other unsecured claims (ranging from 4% to 34%), violated § 1322(b)(1).

**10.** 939 F.2d 669 (8th Cir.1991).

**11.** *Id.* at 672.

**12.** *See In re Sperna,* 173 B.R. 654 (9th Cir. BAP 1994) (applying the four part test adopted in *In re Wolff,* 22 B.R. 510 (9th Cir. BAP 1982) to two cases to determine whether separate classification and full payment of nondischargeable student loan while paying other unsecured creditors 1.4% in one case, and 12.21% in the other case, was unfair discrimination); *In re Anderson, supra* at 229; *In re Tucker,* 130 B.R. 71, 73 (Bankr.S.D.Iowa 1991) (Plan that proposed to pay 100% to student loans and 13% to other unsecured creditors lacked a reasonable basis for discrimination); *In re Saulter,* 133 B.R. 148, 149 (Bankr.W.D.Mo.1991) (Plan that proposed to pay 100% to student loan creditor and 10% to all other unsecured creditors unfairly discriminated against class of general unsecured creditors; court's decision based on first two criteria).

discriminates unfairly against other unsecured claims involves a balancing of the relative benefits and detriments allocated to the debtor and creditors from the proposed discrimination. This test is best articulated in *In re Colfer*[13] and is very similar to the baseline test discussed below. The comparison of the benefits and detriments must be made in light of the legitimate interests and expectations of the parties-in-interest in chapter 13 proceedings as expressed by Congress.

### The Baseline Test

Yet a third approach for determining whether a separate classification of student loan debt discriminates unfairly against other unsecured creditors is articulated by the First Circuit Bankruptcy Appellate Panel in *In re Bentley*[14] and is what this Court will refer to as the "baseline test." Under this approach, the court looks to four guiding principles of chapter 13 itself for what is the norm, or the baseline from which departures can be evaluated for fairness: (1) equality of distribution;[15] (2) nonpriority of student loans;[16] (3) mandatory vs. optional contri-

butions;[17] and (4) the debtor's fresh start.[18]

When a plan prescribes different treatment for two classes but, despite the differences, offers to each class benefits and burdens that are equivalent to those it would receive at the baseline, then the discrimination is fair. On the other hand, when the discrimination alters the allocation of benefits and burdens to the detriment of one class, the discrimination is unfair and prohibited.[19]

Applying this analysis in *Bentley*, the court concluded that a plan proposing to pay student loan obligations in full and to pay all other unsecured claims a dividend of 3% discriminates unfairly against the class of other unsecured creditors. Such a plan redistributed the benefits and burdens to the debtor's benefit and the unsecured creditors' detriment when compared to the normal chapter 13 treatment. The Seventh Circuit Court of Appeals has recently cited *Bentley's* baseline test favorably.[20]

### The Debtor's Interest

The debtors rely primarily on *In re Boggan*[21] which appears to this Court to

**13.** 159 B.R. 602 (Bankr.D.Me.1993).

**14.** 266 B.R. 229 (1st Cir. BAP 2001).

**15.** As a general rule, fairness requires equality of distribution among nonpriority unsecured creditors. *Id.* at 240.

**16.** Nothing in the Bankruptcy Code gives priority to student loan obligations nor requires their payment in full. *Id.* at 241.

**17.** This requires a comparison of what the dischargeable unsecured creditors would receive in a pro rata distribution of the mandatory contribution under chapter 13 (all of debtor's disposable income for a minimum three year period). *Id.* at 241.

**18.** In chapter 13, the debtor does not emerge from bankruptcy totally free of all prepetition debt; absent undue hardship, chapter 13 ex-

pressly excepts student loan debt from discharge. *Id.* at 242.

**19.** *Id.* at 240.

**20.** *See In re Crawford*, 324 F.3d 539, 542 (7th Cir.2003), where in the context of separately classifying a nondischargeable child support obligation Judge Posner observed that the discriminatory treatment proposed must be viewed in light of the purposes of chapter 13 and must take into account the interests of the creditors in repayment. A plan that proposed to pay two-thirds of the nondischargeable debt while other unsecured creditors received nothing, unfairly discriminated the other unsecured creditors and effectively shifted two-thirds of the nondischargeable debt on the other unsecured creditors.

**21.** 125 B.R. 533 (Bankr.N.D.Ill.1991).

represent a clear minority view. In that case, the debtor proposed to pay the student loan in full while paying 15% of the other unsecured claims. The bankruptcy court focused on whether the discrimination furthered a legitimate interest of the debtor. Specifically, the court concluded that the debtor's interest in emerging from bankruptcy free of nondischargeable student loan obligations, with a fresh start, is a legitimate interest and thus did not constitute unfair discrimination.

The debtors in the case at bar make the same argument here although factually this case is very different. Here the debtors do not propose to pay the nondischargeable student loan in full while paying a portion of other unsecured debt. Rather, the debtors propose to pay *17%* of the student loan obligation while paying nothing to the other general unsecured creditors. Under the debtors' Amended Plan, debtors will in any event emerge from bankruptcy with a nondischargeable student loan obligation. They will simply emerge from bankruptcy with a slightly-reduced student loan obligation if the Amended Plan is confirmed.[22]

■ This Court does not find *Boggan* persuasive and declines to follow it.[23] Numerous courts have rejected the premise that the nondischargeability of a claim (or the "fresh start" philosophy), in and of itself, is a legitimate debtor interest that permits preferential treatment of student loan creditors.[24]

*Application of the Tests in this Case*

■ The debtors rely exclusively on the fact that their student loan debt is nondischargeable as the basis for their separate classification of the student loan claims and justification for discriminating against the class of general unsecured creditors. They assert that the proposed discrimination furthers the fresh start philosophy of bankruptcy. The trustee contends that debtors' discriminatory treatment of unsecured creditors is unfair under all of the above enumerated tests. This Court agrees.

A. The four-part test.

Debtors cannot meet the first prong of this test—showing a reasonable basis for the discrimination. As noted above in this Court's discussion of *Boggan,* the clear weight of authority holds that the mere fact that student loan claims are not dischargeable is an insufficient basis for discrimination. The Court further questions the relationship between the degree of discrimination to the basis for the discrimination—nondischargeability and fresh start. Debtors propose to pay nothing to the other unsecured creditors yet this degree of discrimination will not pay in full the debtors' student loan obligations. The payment of all available monies to the student loan creditors will only result in a modest reduction in the amount of the student loan obligation that would survive debtors' discharge. In short, even with the degree of discrimination proposed

---

**22.** The amount of the nondischargeable student loan debt will be roughly either $26,000 or $29,000, depending upon whether the other unsecured creditors share pro rata in the distributions.

**23.** This Court agrees with the reasoning in *Bentley* where the First Circuit BAP observed that chapter 13 and § 1322(b)(1) contemplate consideration of the interests of the affected

classes, and not solely consideration of the debtor's interest. 266 B.R. at 239.

**24.** *See In re Sperna,* 173 B.R. 654, 658 (9th Cir. BAP 1994); *In re Groves, supra* at 216; *In re Willis, supra* at 914–15; *In re Colfer, supra* at 609–10; *In re Anderson, supra* at 230; *In re Tucker, supra* at 73; *In re Saulter, supra* at 149.

debtors will not eliminate the nondischargeable debt.

Nor is there any evidence in the record before this Court to enable the Court to make findings on the other prongs of the four-part test. For example, debtors have come forward with nothing of evidentiary value demonstrating that they are unable to carry out a plan of reorganization without the discriminatory provision. It is apparent to this Court that the debtors could easily proceed under chapter 13 without preferential treatment of the student loan creditors. There is nothing in the record suggesting any necessity for or anticipated hardship as a result of the student loan creditors participating pari passu in the dividend distribution.

In sum, debtors have failed to meet their burden of proving that the separate classification and preferential treatment of their student loan creditors does not unfairly discriminate against the class of other unsecured creditors.

### B. The balancing test.

An analysis of the relative benefits and detriments to the debtors, the student loan creditors, and the general unsecured creditors also militates against debtors. Under the Amended Plan, the student loan creditors are given priority over other unsecured creditors that is not provided for by any provision in chapter 13. At the same time, the student loan creditors retain the right to collect the balance of the student loan obligations after debtors' discharge, while other unsecured creditors are left with no such recourse. The debtors gain a reduction in the amount of the nondischargeable debt that will remain upon completion of the Amended Plan and a discharge of all the other unsecured claims, without paying any dividend to the holders of the unsecured claims. Because of the discharge, the only means available for other unsecured creditors to be paid anything on their claims is eliminated. Clearly, what is the debtors' burden for the nondischargeable student loan debt has been unfairly shifted to the unsecured creditors. The treatment afforded the student loan creditors discriminates unfairly against the unsecured creditors under the balancing test.

### C. The baseline test.

Here, the case against confirmation is even more persuasive. The unsecured creditors are denied any distribution whatsoever during the 56 month period in which they can hope to recover anything while the student loan creditors, who will have the ability to collect long after the discharge is granted, receive all of the distribution.

Chapter 13 is directed at allowing debtors to retain their assets while under the Court's protection on the condition that they make regular payments to their creditors for a minimum period of time, even their unsecured creditors. Preferring holders of nondischargeable, unsecured claims like these without some showing of need or hardship results in a judge-created "priority." Congress well knows how to create priorities, and would have expressly accorded priority to student loans, had that been its intent.[25] Given that lack of priority, chapter 13 contemplates that student loan creditors share equally in distributions like all other unsecured creditors. Debtors' Amended Plan alters chapter 13's priority and distribution schemes to the detriment of the general unsecured creditors.

Moreover, given the fact that the unsecured creditors will realize nothing on their claims until the tail end of the

---

25. *See* § 507(a).

Amended Plan, well beyond the minimum plan term of 36 months, the nature of the distributions to the student loan creditors are purely discretionary. The debtors again have given no reasonable basis, other than nondischargeability, for preferring the student loan creditors to the exclusion of other unsecured creditors. Thus, the unsecured creditors not only do not receive a pro rata share of mandatory contributions under the Amended Plan as contemplated by Chapter 13, they do not receive any of the discretionary contributions. Such discriminatory treatment is unfair.

■ The debtors justify their favorable treatment of the student loan creditors by their interest in obtaining a "fresh start." This argument might have some facial appeal if debtors were paying their nondischargeable student loan debt in full through the Amended Plan. Here, however, debtors propose to pay only 17% of the student loan debt. Thus, at the completion of the Amended Plan the debtors will not be freed of their student loan obligations. Although debtors are not paying the student loan debt in full, payment of the entire dividend that would ordinarily be available to all unsecured creditors reduces the amount of the nondischargeable debt and gives the debtors a "head start" that is not otherwise provided by chapter 13. Indeed, the "fresh start" in chapter 13 is not without limit. Congress has addressed the scope of the fresh start in chapter 13 and has determined that student loan obligations shall survive discharge. Debtors' effort to mitigate the consequences of nondischargeable student loan debt outside the statutory scheme of chapter 13 is unfair discrimination under the facts of this case.

■ The Court concludes that when debtors' treatment of nonpriority unsecured creditors under the Amended Plan is compared to their normal treatment under chapter 13, the proposed discrimination alters the allocation of benefits and burdens to the detriment of the class of general unsecured creditors and is therefore unfair. Debtors' proposed discriminatory treatment of general unsecured creditors does not pass the baseline test.

■ This Court finds persuasive the logic and reasoning of the First Circuit BAP in *Bentley*. In its view, the baseline test is most loyal to the objective goals and motivations of Chapter 13 and the Bankruptcy Code. It is essentially objective and measurable in that it would require courts to determine (1) whether the preferred debt is accorded statutory priority; (2) whether the unsecured creditors would receive at least as much as they would receive without the debt being preferred; (3) whether the unsecured creditors would receive a fair pro rata share of the debtor's mandatory contribution of disposable income (and, if not, whether the debtor has agreed to make an additional contribution to "square up" the unsecured creditors' distribution); and whether the preferential treatment of one creditor somehow furthers the debtor's fresh start. The baseline test appeals to this Court as objective and fairly easy to implement. It is in accord with the statutory scheme of priority established by the Code and prevents the courts from legislating priorities as these debtors would have this Court do today.

*Conclusion*

The Court concludes that debtors have failed to meet their burden of showing that the Amended Plan does not discriminate unfairly against the class of general unsecured creditors. The debtors propose paying all seventeen percent of the anticipated dividend to the student loan creditors while paying nothing (not the "very small amount" euphemistically referred to in debtors' brief at page 4) to the other unse-

cured creditors. Were debtors to pay the student loan creditors pari passu with the others, the plan would yield a seven percent dividend to all unsecured creditors. Even if debtor's plan were confirmed as submitted, and all of the payments under the plan were made, some 83 percent of the student loan obligations would remain unpaid at discharge and nondischargeable. This does not compare favorably to the 93 percent that would remain were the discrimination provision dropped. The unsecured creditors are unduly burdened to benefit the holders of nondischargeable student loan debt. No coherent reason to approve this discriminatory treatment is given. As the debtors will only benefit marginally and the creditors will be unduly harmed, the Court concludes that the proposed treatment discriminates unfairly against the general unsecured creditors. On these facts, the trustee's objection to the debtors' Amended Plan is sustained and confirmation of the Amended Plan is denied.